Mr. Justice BRADLEY
 

 delivered the opinion of the court.
 

 This case-comes before us on a certificate of division in opinion between the judges of the Circuit Court for the District of Massachusetts on appeal from the District Court of that district. When this division of opinion occurred the Circuit Court was being held by the associate justice of this court allotted to the first circuit and the circuit judge of that circuit, sitting together. It becomes necessary, therefore, in the first place, to decide whether a difference of opinion between these judges sitting in the Circuit Court may be certified to this court under the act of April 29, 1802. The language of the act is broad enough to include the case. It is as follows: “ Whenever any question shall occur before a Circuit Court, upon which the opinions of the judges shall be opposed, the point- upon which the disagreement shall happen shall, during the same term, upon the request of either party or their counsel, be stated under the direction of the judges, and certified under the seal of the court, to the Supreme Court, at their next session to be held thereafter, and shall by the said court be finally decided.” -But it has been suggested that, although the case is included in the terms of the act, it is not within its meaning, because the constitution of the circuit has been changed by the recent act creating circuit judges, passed April 10, 1869. There is nothing in this act which alters the powers of the court, or'obviates the difficulty which a certificate of division was intended to meet. That difficulty arose from
 
 *22
 
 the fact that the court was constituted 'of two judges, between whom a difference of opinion would be likely often to occur, and thus block the wheels of justice. Other things being equal, a division of opinion is far more probable between
 
 tiuo
 
 persons than is an equal division between any other even number of persons. This renders it desirable, when a court consists of the former number, to have some method provided for overcoming the intrinsic difficulty. Such a method was provided by the act of 1802 to meet the then constitution of the court, which consisted of a justice of the Supreme Court and the district judge. The act of 1869 has created a new circuit judge, it is true, but he is invested with precisely the same power.and jurisdiction in his circuit as the justice of the Supreme Court has therein, whilst the powers of the latter, as judge of the circuit, are the same.as before, and the court is to be held either by one of them or the district judge, or any two of the three. Thus the same necessity exists as before for the power to certify questions to the Supreme.Court. As the mischief remains the same, and the terms of the act of 1802 are general and adequate to continue the remedy, such a construction of it as will have that effect seems to be fairly warranted.
 
 *
 

 We, therefore, conclude that the case is properly brought before us by certificate.
 

 The case, as thus brought before us, presents the question, whether the District Court for the District of Massachusetts, sitting in admiralty, has jurisdiction to entertain a libel
 
 in personam
 
 on a policy of marine insurance to recover for a loss.
 

 This precise question has never been decided by this court. But, in our view, several decisions have been made which determine the principle on which the ease depends. The general jurisdiction of the District Courts in admiralty and maritime eases has been heretofore so fully discussed that it is only necessary to refer to them very briefly on this occasion.
 

 
 *23
 
 The Constitution declares that the judicial power of the United States shall extend “to ali cases of admiralty and maritime jurisdiction,” without defining the limits of that jurisdiction. Congress, by the Judiciary Act passed at its first session, 24th of September, 1789, established the District Courts, and conferred upon them, among other things, “ exclusive original cognizance of all civil cases of admiralty and maritime jurisdiction.”
 

 As far as regards civil cases, therefore, the jurisdiction of these courts was thus made coextensive with the constitutional gift of judicial power on this subject.
 

 Much controversy has arisen with regard to the extent of this jurisdiction. It is well known that in England great jealousy of the admiralty was long exhibited by the courts of common law.
 

 The admiralty courts were originally established in that and other maritime countries of Europe for the protection of commerce and the administration of that venerable law of the sea which reaches back to sources long anterior even to those of the civil law itself; which Lord Mansfield says is not the law of any particular country, but the general law of nations; and which is founded on the broadest principles of equity and justice, deriving, however, much of its completeness and symmetry, as well as its modes of proceeding, from the civil law, and embracing, altogether, a system of regulations embodied and matured by the combined efforts of the most enlightened commercial nations of the world. Its system of procedure has been established for ages, and is essentially founded, as we have said, on ’the civil .law; and this is probably one reason why so much hostility was exhibited against the admiralty by the courts of common law, and why its jurisdiction was so much more crippled and restricted in England than in any other state. In all other countries bordering on the Mediterranean or the Atlantic the marine courts, whether under the name of admiralty courts or otherwise, are generally invested with jurisdiction of all matters arising in marine commerce, as well as other marine matters of public concern, such as crimes
 
 *24
 
 committed on the sea, captures, and even naval affairs. But in England, partly under strained constructions of parliamentary enactments and partly from assumptions of public policy, the common law courts succeeded in establishing the general rule that the jurisdiction of the admiralty was confined to the
 
 high
 
 seas and entirely excluded from transactions arising on waters within the body of a county, such as rivers, inlets, and arms of the sea as far out as the naked eye could discern objects from shore to shore, as well as from transactions arising on the land, though relating to marine affairs.
 

 . With respect to contracts, this criterion of locality was carried so far that, with the exception of the cases of seamen’s wages and bottomry bonds, no contract was allowed to be prosecuted in the admiralty unless it was made upon the sea, and was to be executed upon the sea; and even then it must not be under seal.
 

 Of course, under such a construction of the admiralty jurisdiction, a policy of insurance executed on land would be excluded from it.
 

 But this narrow view has not prevailed here. This court has frequently declared and decided that the admiralty and maritime jurisdiction of the United States is not limited either by the restraining statutes or the j udicial prohibitions of England, but is to be interpreted by a more enlarged view of its essential nature and objects, and with reference to analogous jurisdictions in other countries constituting the maritime commercial world, as well as to that of England. “Its-boundary,” says Chief Justice Taney,
 
 *
 
 “ is to be ascertained by a reasonable and just construction of the words used in the Constitution, taken in connection with the whole instrument, and the purposes for which admiralty and maritime j urisdietion was granted to the Federal government.” “ Courts of' admiralty,” says the same judge in another case,
 
 †
 
 “ have been found necessary in all commercial couu
 
 *25
 
 tries, not only for the safety and convenience of commerce, and the speedy decision of controversies where delay would often be ruin, but also to administer the laws of nations in a season of war, and to determine the validity of captures and questions of prize or no prize in a judicial proceeding. And it would be contrary to the first principles on which ’the Union was formed to confine these rights to the States' bordering on the Atlantic, and to the tide-water rivers connected with it, and to deny them to the citizens who border on the lakes and the great navigable streams which flow through the Western States.”
 

 In accordance with this more enlarged view of the subject, several results have been arrived at widely differing from the long-established rules of the English courts.
 

 First, as to the
 
 locus
 
 or territory of maritime jurisdiction; that is, the place or territory
 
 where
 
 the law maritime prevails, where torts must be committed, and where business must be transacted, in order to be maritime in their character; a long train of decisions has settled that it extends not only to the main sea, but to all the navigable waters of the United States, or bordering on the samé, whether landlocked or open, salt or fresh, tide or no tide. “ Are we bound to say,” — says Justice Wayne, delivering the opinion of the court in
 
 Waring
 
 v.
 
 Clarke
 

 *
 

 — “ Are we bound to say, because it has been so said by the common law courts of England in reference to the point under discussion, that
 
 sea
 
 always means
 
 high sea
 
 or
 
 main sea ?
 
 ... Is there not a surer foundation for a correct ascertainment of the locality of marine jurisdiction in the general admiralty law than the designation of it by the common law courts? . . . We think, in the controversy between the courts of admiralty and common law upon the subject of jurisdiction, that the former have the best of the argument; that they maintain the jurisdiction for which they contend with more learning, more directness of purpose, and without any of that verbal subtilty which is found in the arguments of their adversaries.”
 

 
 *26
 
 It was a long time, however, before the full extent of the admiralty jurisdiction was firmly established. Th e Judiciary Act expressly extended it to seizures, under laws of impost, navigation, or trade of the United States, where made on waters navigable from the sea by vessels of ten or more tons burden as well as upon the high seas, thus at once ignoring the English rule; but for some time it was held that the’ jurisdiction could .not go further, and that this grant was confined to tide-waters. But in the case of
 
 The Genesee
 
 Chief,,
 
 *
 
 decided in 1851, it was expressly adjudged that tide was no criterion of admiralty jurisdiction in this country; that it extended to our great internal lakes and navigable ■rivers as well as to tide-waters. “ It is evident,” says Chief Justice Taney,
 
 †
 
 “that a definition which would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible. We have thousands’of miles of public navigablé water, including lakes and rivers,.in which.there is no.tide. And certainly there can be no reason for admiralty power over a public tide-water which does not apply with equal force to any other public water used for commercial purposes and foreign trade. The lakes and the waters connecting them are undoubtedly public waters, and, we think, are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States.” This judgment has been followed by several eases since decided, and the point must be considered as no longer open for discussion in this court.
 

 Secondly, as to
 
 contracts,
 
 it has been equally well settled that the English rule which concedes jurisdiction, with a few exceptions, only to contracts made upon the sea and to be executed thereon (making
 
 locality
 
 the test) is entirely inadmissible, and that the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, haying reference to maritime service or maritime transactions. Even in England the courts felt compelled to rely on this criterion in order to’sustain the admiralty juris
 
 *27
 
 diction over bottomry bonds, although it involved an inconsistency with their rules in almost every other case. In
 
 Mencione
 
 v.
 
 Gibbons
 

 *
 

 Lord Kenyon makes this sensible remark: “If the admiralty has jurisdiction over the subject-matter, to say that it is necessary for the parties to go upon the sea to execute the instrument, borders upon absurdity.” In that case there happened to be a seal on the bond, of which a strong point was made. Justice Buller answered it thus: “ The form of the bottomry bond does not vary the jurisdiction; the question whether the court of admiralty has or has not jurisdiction depends on
 
 the subject-matter.”
 
 Had these views actuated the common law courts at an earlier day it would have led to a much sounder rule as to the limits of admiralty jurisdiction than was adopted. In this court, in the case of
 
 The New Jersey Navigation Company
 
 v.
 
 Merchant's Bank,
 

 †
 

 which was a libel
 
 in personam
 
 against the company on a contract of affreightment to recover for the loss of specie by the burning of the steamer Lexington on Long Island Sound, Justice Nelson, delivering the opinion of the court, says:
 
 ‡
 
 “ If the cause is a maritime cause, subject to admiralty, cognizance, jurisdiction is complete over the person as well as over the ship. . , . On looking into the several cases in admiralty which have come before this court, and in which its jurisdiction was involved, it will be found that the inquiry has been, not into the jurisdiction of the court of admiralty in England, but into the nature and subject-matter of the contract, whether it was a maritime contract, and the service a maritime service, to be performed upon the sea or upon waters within the ebb and flow of the tide.” [The last distinction based on tide, as we have seen, has since been abrogated.] Jurisdiction in that case was sustained by this court, as it had previously been in cases of suits by ship-carpenters and material-men on contracts for repairs, materials, and supplies, and by pilots for pilot-age: in none of which would it have .been allowed to the admiralty courts in England.
 
 §
 
 In the subsequent ease of
 
 *28
 

 Morewood
 
 v.
 
 Enequist
 

 *
 

 decided in 1859, which was a case of charter-party and affreightment, Justice Grier, who had dissented in the case of The Lexington, but who seems to have changed his views on the w’hole subject, delivered the opinion of the court, and, amongst, other things, said: “ Counsel have expended much learning and ingehuity in an attempt to demonstrate that a court of admiralty in this country, like those of England, has no jurisdiction over contracts of charter-party or affreightment. They do not seem to deny that these are maritime contracts, according to any correct .definition of the terms, but rather require us to abandon our whole course of decision on this subject and return to the fluctuating decisions of English commoii law judges, which, it has been truly said, ‘ are founded on no uniform principle, and exhibit illiberal jealousy and narrow prejudice.’ ” He adds that the court did not feel disposed to be again drawn into the discussion; that the subject had been thoroughly investigated in the case of The Lexington, and that they had then decided “that charter-parties and contracts of affreightment were ‘ maritime contracts,’ within the true meaning and construction of the Constitution and act of Congress, and cognizable in courts of admiralty by process either
 
 in rem
 
 or
 
 in
 
 personam.” The case of
 
 The People’s Ferry Co.
 
 v.
 
 Beers,
 

 †
 

 being pressed upon the court, in which it had been adjudged that a contract for building a vessel was not within the admiralty jurisdiction, being a contract
 
 made
 
 on land and to be
 
 performed
 
 on laud, Justice Grier remarked.: “The court decided in that case that a contract to build a ship is
 
 not a maritime contract;”
 
 but he intimated that the opinion in that case must be construed in connection with the precise question befoi’e the court; in other words, that the effect of that decision was not to be extended by implication to other cases.
 

 In the case of
 
 The Moses Taylor,
 

 ‡
 

 it was decided that a contract to carry passengers by sea as well as a contract to carry goods, was a maritime contract and cognizable in ad
 
 *29
 
 miralty, although a small part of the transportation was by land, the principal portion being by water. In a late case of affreightment, that of
 
 The ■Belfast
 

 *
 

 it was contended that admiralty jurisdiction did not attach, because the goods were to be transported only from one port to another in the same State, and were not the subject of interstate commerce. But as the transportation was on a navigable river, the court decided in favor of the jurisdiction, because it was a maritime transaction. Justice Clifford, delivering the opinion of the. court, says:
 
 †
 

 “
 
 Contracts, claims, or service, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in the admiralty courts. Torts or injuries committed on navigable waters, of a civil nature, are also cognizable in the admiralty courts. Jurisdiction in the former case depends upon the nature of the contract, but in the latter it depends entirely upon the locality.”
 

 It thus appears that in each case the decision of the court and the reasoning on which it was founded have been based upon the fundamental inquiry whether the contract was or was not a
 
 maritime
 
 contract. If it was, the jurisdiction was asserted; if it was not, the jurisdiction was denied. And whether maritime or not maritime depended, not on the place where the contract wás made, but on the
 
 subject-matter
 
 of the contract. If that was maritime the contract was maritime. This may be regarded as the established doctrine of the court. '
 

 The subject could be very copiously illustrated by reference to the decisions of the various District and Circuit Courts. But it is unnecessary. The authoritative decisions of this court have settled the general rule, and all that remains to be done is to apply the law to each case as it arises.
 

 It only remains, then, to inquire whether the contract of marine insurance, as set forth in the present case, is or is not a maritime contract.
 

 
 *30
 
 It is objected that it is not a maritime contract because it is made on the land and is to be performed (by payment of the loss) on the land, and is, therefore, entirely a common law transaction. This objection would equally apply to bottomry and respondentia loans, which are also usually made on the land and are to be paid on the land. But in both cases payment is made to depend on a maritime risk; in the one case upon the loss of the ship or goods, and in the other upon their safe arrival at their destination. So the contract of affreightment is also made on land, and is to be performed on the land by the delivery of the goods and payment of the freight. It is true that in the latter case a maritime service is to be performed in the transportation of the goods. But if we carefully analyze the contract of insurance we shall find that, in effect, it is a contract, or guaranty, on the part of the insurer, that the ship or goods shall pass safely over the sea, and through its storms and its many casualties, to the port of its destination; and if they do not pass safely, but meet with disaster from any of the misadventures insured against, the insurer will pay the loss sustained. So in the contract of affreightment, the master guarantees that the goods shall be safely transported (dangers of the seas excepted) from the port of shipment to the port of delivery, and there delivered. The contract of the. one guarantees against loss from the dangers of the sea, the contract of the other against loss from all other dangers. Of course these contracts do not always run precisely parallel to each other, as now stated; special terms are inserted in each at the option of the parties. But this statement shows the general nature of the two contracts. And how a fair mind can discern any substantial distinction between them on the question whether they are or are not, maritime contracts, is difficult to imagine. The object of the two contracts is, in the one case, maritime service, and in the other maritime casualties.
 

 And then the contract of insurance, and the rights of the parties arising therefrom, are affected by and mixed up with all the questions that can arise in maritime commerce, — -jet
 
 *31
 
 tison, abandonment, average, salvage, capture, prize, bottomry, &o.
 

 Perhaps the best criterion of the maritime character of a contract is the system of law from which it arises and by which it is governed. And it is well known that the contract of insurance sprang from the law maritime, and derives all its materiál rules and incidents therefrom. It was unknown to the common law; and the common law remedies, when applied to it, were so inadequate and clumsy that disputes arising out of the contract were generally left to arbitration, until the year A. D. 1601, when the statute of 43 Elizabeth was passed creating a special court, or commission, for hearing and determining causes arising on policies of insurance. The preamble to that act, after mentioning the great benefit arising to commerce by the use of policies of insurance, has this singular statement: “And whereas, heretofore such assurers have used to stand so justly and precisely upon tlieir credits as few or no controversies have arisen thereupon, and if any have grown the same have, from time to time, been ended and ordered by certain grave and discreet merchants appointed by the lord mayor of the city of London, as men, by reason of their experience, fittest to understand and speedily to decide those causes, until of late years that divers persons have withdrawn themselves from that arbitrary course, and have sought to draw the parties assured to seek their moneys of every several assurer by .suits commenced in her majesty’s courts, to their great charges and delays.” The commission created by this act ■was to be directed to the judge of the admiralty for the time being, the recorder of London, two doctors of the civil law, and two common lawyers, and eight grave and discreet merchants. The act was thus an acknowledgment of the jurisdiction to which the case properly belonged. Had it not been for the jealousy exhibited by the common law courts against the court of admiralty, in prohibiting its cognizance of policies of insurance half a century before,
 
 *
 
 the
 
 *32
 
 latter court, as the natural and proper tribunal for determining all maritime causes, would have furnished a remedy at once easy, expeditious, and adequate. It was only after the common law, under the influence of Lord Mansfield and other judges of .enlightened views, had imported into itself the various provisions of the law maritime relating to insurance, that the courts at Weétminster Hall began to furnish satisfactory relief to suitors. And even then, as remarked by Sir "W. D. Evans, “ the inadequacy of the existing law to settle,
 
 jproprio vigore,
 
 complicated questions of average and contribution, is very manifest and notorious. Such questions are, by consent, as matter of course, and from conviction of counsel that justice cannot be attained in any other way, referred to private' examination; but a law can hardly be considered as perfect which is not possessed of adequate powers within itself to complete its purpose, and which requires the extrinsic aid of personal consent.”
 
 *
 
 The contrivances to which Lord Mansfield resorted to remedy in a measure these difficulties are stated by Mr. Justice Parke in the introduction to his work on insurance.
 

 These facts go to show, demonstrably, that the contract of marine insurance is an exotic in the common law. And we know the fact, historically,, that its first appearance in any code or system of laws was in the law maritime as promulgated by the various maritime states and cities of Europe. It undoubtedly grew out of the doctrine of contribution and general average, which is found in the maritime laws of the ancient. Rhodians. By this law, if either ship, freight, or cargo was sacrificed to save the others, all had to contribute' their proportionate share of the loss. This division of loss naturally suggested a previsional division of risk; first, amongst, those engaged in the same enterprise; and, next, amongst associations of ship-owners and shipping merchants. Hence it is found that the earliest form of the contract of insurance was that of mutual insurance, which, according to Pardessus, dates back to the tenth century, if not earlier,
 
 *33
 
 and in Italy and Portugal was made obligatory. By a regulation of the latter kingdom, made in the fourteenth century, every ship-owner and merchant in Lisbon and Oporto was bound to contribute two per cent, of the profits of each voyage to a common fund from which to pay losses whenever they should occur.
 
 *
 
 The next step in the system was that of insurance upon premium. Capitalists, familiar with the risks of navigation, were found willing to guaranty .against them for a small consideration or premium paid. This, the final form of the contract, was in use as early as the beginning of the fourteenth century,
 
 †
 
 and the tradition is, that it was introduced into England in that century by the Lombard merchants who settled in London and brought with them the maritime usages of Venice and other Italian cities. Express regulations respecting the contract, however, do not appear in any code or compilation of laws earlier than the commencement of the fifteenth century. The earliest which Pardessus was able to find were those contained in the Ordinances of Barcelona, A.D. 1435; of Venice, A.D. 1468; of Florence, A. D. 1523; of Antwerp, A. D. 1537, &c.
 
 ‡
 
 Distinct traces of earlier regulations are found, but the ordinances themselves are not extant. In the more elaborate monuments of maritime law which appeared in the sixteenth and seventeenth centuries, the contract of insurance occupies a large space. The
 
 Guidon de la Mcr,
 
 which appeared at Rouen at the close of the sixteenth century, was an elaborate treatise on the subject; but, in.its discussion, the principles of every other maritime contract were explained. In the celebrated marine ordinance of Louis XIV, issued in 1681, it forms the subject of one of the principal titles.
 
 §
 
 As is well known, it has always formed a part of the Scotch maritime law.
 

 Suffice it to say, that in every maritime code of Europe, unless England is excepted, marine insurance constitutes one of the principal heads. It is treated in nearly every
 
 *34
 
 one of those collected by Pardessus, except the more ancient ones, which were compiled before the contract had assumed its place in written law. It is, in fact, a part of the general maritime law of the worldslightly modified, it is true, in each country, according to the circumstances or genius of the people. Can stronger proof be presented that the contract is a maritime contract ?
 

 But an additional argument is found in the fact that in all other countries, except England, even in Scotland, suits and controversies arising upon the contract of marine insurance are within the jurisdiction of the admiralty or other marine courts.
 
 *
 
 The French Ordinance of 1681 touching the Marine, in enumerating the cases subject to the jurisdiction of the judges of adriiiralty, expressly mentions those arising upon policies of assurance, and concludes with this broad language: “And generally all contracts concerning the commerce of the sea.”
 
 †
 
 The Italian writer, Roceus, says: “These subjects of insurance and disputes relative to ships are to be decided according to maritime law, and the usages and customs of the sea are to be respected. The proceedings are to be ¿ccording to the forms of maritime courts and the rules and principles laid down in the book called ‘ The Consulate of the Sea,’ printed at Barcelona in the year 1592.”
 
 ‡
 

 It is also clear that, originally, the English admiralty had jurisdiction of this as well as of other maritime contracts. It is expressly included in the commissions of the Admiral.
 
 §
 
 Dr. Browne says: “ The cognizance of policies of insurance was of old claimed by the Court of Admiralty, in which they had the great advantage attending all their proceedings as to the examination of witnesses beyond the seas or speedily going out of the kingdom.”
 
 ǁ
 
 But the intolerance of the common law courts prohibited the exercise of it. In the early case' of
 
 Crane
 
 v.
 
 Bell,
 
 38 Hen. VIII, A. D. 1546, a
 
 *35
 
 prohibition was granted for this purpose.
 
 *
 
 Mr. Browne says, very pertinently: “ "What is the rationale, and what the true principle which ought to govern this question, viz.: "What contracts should be cognizable in admiralty ? Is it not this? All contracts which relate purely to maritime affairs, the natural, short, and easy method of enforcing which is found in the admiralty proceedings.”
 
 †
 

 Another consideration bearing directly on this question is the fact that the commissions in admiralty issued to our colonial governors and admiralty judges, prior to the Revolution, which may be fairly supposed to have been in the minds of the Convention which framed the Constitution, contained either express jurisdiction over policies of insurance or such general jurisdiction over maritime contracts as to embrace them.
 
 ‡
 

 The discussions that have taken place in the District and Circuit Courts of the United States have not been adverted to. Many of them are characterized by much learning and research. The learned and exhaustive opinion of Justice Story, in the case of
 
 De Lovio
 
 v. Roii,
 
 §
 
 affirming the admiralty jurisdiction over policies of marine insurance, has never been answered, and will always stand as a monument of his great erudition. That case was decided in 1815. It has been followed in several other cases in the first circuit.
 
 ǁ
 
 In 1842 Justice Story, in reaffirming his first judgment, says that he had reason to believe that Chief Justice Marshall and Justice "Washington were prepared to maintain the jurisdiction. What the opinion of the other judges was he did not know.
 
 ¶
 
 Doubts as to the jurisdiction have occasionally been expressed by other judges. But we are of opinion that the conclusion of Justice Story was correct.
 

 The answer of the court, therefore, to the question propounded by the Circuit Court will be, that the District Court
 
 *36
 
 for the District of Massachusetts, sitting in admiralty, has. jurisdiction to entertain the libel in this ease. .
 

 Answer accordingly.
 

 2 Stat. at Large, 159.
 

 16 Id. 44.
 

 *
 

 See Ex parte Zellner, 9 Wallace, 244.
 

 *
 

 The Steamer St. Lawrence, 1 Black, 527.
 

 †
 

 The Genesee Chief, 12 Howard, 454.
 

 *
 

 5 Howard, 462.
 

 *
 

 12 Howard, 443.
 

 †
 

 Id. 457.
 

 *
 

 8 Term, 269.
 

 †
 

 6 Howard, 344.
 

 ‡
 

 lb. 392.
 

 §
 

 See cases cited by Justice Nelson, 6 Howard, 890, 391.
 

 *
 

 23 Howard, 493.
 

 †
 

 20 lb. 401.
 

 ‡
 

 4 Wallace, 411.
 

 *
 

 7 Wallace, 624.
 

 †
 

 7 Ib. 637.
 

 *
 

 4 Institutes, 139.
 

 *
 

 Evans’s Statutes, vol. ii, p. 226, 3d ed.
 

 *
 

 2 Pardessvs, Lois Maritimes, 369; 6 Id. 303.
 

 †
 

 Id. vol. 2, pp. 369, 370; vol. 4, p. 566; vol. 5, pp. 331, 493.
 

 ‡
 

 Id. vol. 5, pp. 493, 65; vol. 4, pp. 598, 37.
 

 §
 

 Lib. 3, title 6.
 

 *
 

 See Benedict’s Admiralty, § 294, ed. 1870.
 

 ‡
 

 Roceus on Insurance, note 80.
 

 ǁ
 

 2 Browne’s Civil and Admiralty Law, 82.
 

 †
 

 Sea Laws, 256.
 

 §
 

 Benedict, § 48.
 

 *
 

 See 4 Institutes, 139.
 

 ‡
 

 Benedict, chap. ix.
 

 ǁ
 

 Gloucester Insurance Co.
 
 v.
 
 Younger, 2 Curtis, 332-333.
 

 ¶
 

 Hale v. Washington Insurance Co., 2 Story 183.
 

 †
 

 2 Civil and Admiralty Law, 88.
 

 §
 

 2 Gallisón, 398.