## BURRILL et al. v. CROSSMAN et al.

(Circuit Court of Appeals, Second Circuit. April 13, 1904.)

### No. 194.

1. SHIPPING—DEMURRAGE—DEFENSE OF VIS MAJOR.

Where a vessel commenced discharging cargo in Rio de Janeiro on the day that the revolution began there in 1893, in which the insurgents captured government warships in the harbor, and there was thereafter more or less firing between such ships and forts and batteries on shore, and such a condition of affairs was produced by the hostilities as to render it practically impossible to receive the cargo with the dispatch contemplated by the charter, either because of the intrinsic danger incident to unloading or the inability to procure the necessary men to do the work, such condition constituted an unavoidable hindrance, and, to the extent that it prevented compliance with the contract, excused performance, and relieved the charterers from liability under the provision requiring them to pay demurrage for detention by the default of themselves or their agent.

Appeal from the District Court of the United States for the Southern District of New York.

For opinions below, see 111 Fed. 192, and 124 Fed. 838.

Everett P. Wheeler, for appellants.

Lawrence Kneeland, for appellees.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

WALLACE, Circuit Judge. This is an action for demurrage, the libelants claiming that the charterers are liable for the detention of the chartered vessel at the port of Rio de Janeiro during the time of the revolution of 1893.

By the terms of the charter party the cargo of lumber was to be discharged at the port of destination at the average rate of not less

¶ 1. Damages, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; City of Laredo v. International Bridge & Tramway Co., 16 C. C. A. 4.

than 20,000 superficial feet per running day, Sundays excepted. Lay days were to commence from the time the vessel was ready to discharge and gave written notice thereof to the consignees; and for each and every day's detention by default of the charterers $59.46 was to be paid. The vessel arrived at Rio de Janeiro prior to September 4th, and upon that day was ready to discharge, and gave due notice to the consignees, and, having been ordered to her discharging berth, on September 6th commenced to discharge. She had on board 514,000 feet of lumber, and, discharging at the rate of 20,000 feet per day, Sundays excepted, the lay days would have expired October 6th. Her discharge was not completed until November 28th.

The defense of the charterers is that, owing to the existence of the hostilities between the rebels and the government, the consignees were directly or indirectly prevented from doing more than they did to take the cargo. It appears by the proofs that the revolution began September 6th. The insurgents captured the warships of the government lying in the harbor, and the officers and crews of the seized ships went over to the rebels. From that time on the revolted squadron controlled the inner harbor to within a limited distance of the shore line, which was defended by barricades and intrenchments, and with artillery, infantry, and police forces; and there was firing intermittently between the vessels and the forts at the entrance of the harbor and the fortified hills in the city, and occasional fighting in the bay and along the shore. At times the rebel squadron bombarded the city, and at times fired with machine guns and small arms at the troops upon the shore. All this created a condition of fear, suspense, and panic on the part of the population, which resulted in a partial paralysis of business within the city. Foreign commerce was practically suspended. The practice of the government, in impressing the gangs of workingmen employed around the harbor or in the streets into the military service, deterred laborers from accepting employment. The effect of this state of affairs upon the discharging of vessels is fairly characterized in a letter written November 17th to the libelants by their agents in Rio:

"It is, we understand, most difficult to get labor, and many vessels are lying for weeks unable to discharge for want of men. We fear Capt. Wilson will not be able to collect any demurrage in these times, but have told him that he should look to the consignees to make the claim on the owners of the cargo."

By the decree of the court below the libelants were awarded the per diem rate for the whole period of detention between October 6th and November 28th. The court was of the opinion that the indirect effect of such a state of affairs as was shown by the proofs was not to be considered, and that the inquiry was to be confined "to the result of the firing in the vicinity of this vessel which directly affected the discharge of the cargo."

When this cause was considered by the Supreme Court (179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106), it was presented, as to the questions now involved, upon the pleadings, and this question was whether, upon the facts alleged in the answer, the detention of the vessel was caused by default of the charterers or by the acts of the

public enemy. It was not necessary to decide whether, upon the facts now in proof, the charterers were answerable, and the opinion was confined strictly to the point involved. We do not read the opinion of the court as intending to decide that such a condition of affairs at the port of discharge, caused by military hostilities, as would prevent the consignees from obtaining men to engage in unloading the vessel, would not excuse them; and we think the court below fell into error by adhering too literally to some of the expressions in the opinion. One of the cases cited with approval in the opinion of the court is Towle v. Kettell, 5 Cush. 18. In that case the vessel, after reaching her anchorage place for the discharge of her cargo, was ordered into quarantine and moved from the place. The court said:

"The consignees were not bound to receive the cargo under the disadvantages and at the increased expense arising from the remote situation of the vessel. As soon as the vessel was restored to her original place of anchorage, the discharging of the cargo commenced, and proceeded, so far as appears, with all reasonable dispatch."

It was held, inasmuch as the demurrage was recoverable only for the "default" of the defendants, that there was no breach of the charter party, notwithstanding they could have taken the cargo from the place to which the vessel had been removed at some additional expense.

Another of the adjudged cases cited in the opinion of the court was Davis v. Pendergast, 16 Blatchf. 565, Fed. Cas. No. 3,647. By the terms of the charter demurrage was to be paid for every day of detention "by default" of the charterers, and the court placed this construction upon the meaning of the contract:

"The respondents in effect agreed that no more than 45 running days should be occupied in loading and discharging the cargo, unless it was occasioned by some fault of the vessel, or some unusual and extraordinary interruption that could not have been anticipated when the contract was made."

We are of the opinion that if there was such a condition of affairs produced by the hostilities as to render it practically impossible to receive the cargo with the dispatch contemplated by the charter, either because of the intrinsic danger incident to unloading, or the inability to procure the necessary men to do the work, such a condition constituted an unavoidable hindrance, and, to the extent that it prevented compliance with the contract, excused performance.

It is quite impossible to find upon the proofs that the consignees did not receive the cargo as rapidly as was reasonably practicable under the circumstances. Some of their witnesses, no doubt, gave a very highly colored picture of the hostilities; but that the hostilities interfered very seriously with the unlading of the vessels in the harbor, and with this particular vessel, directly or indirectly, it is impossible to doubt. The fact that the consignees took cargo from the vessel on quite a number of days when active hostilities had previously taken place, or took place later in the day, some of them in the immediate vicinity of the vessel, indicates that they were trying to do what lay in their power to facilitate the discharge. The further fact that the libelants, who were doubtless kept informed of the sit-

uation by Capt. Wilson, were during the period of detention instruct-ing their agents to make claim upon the government of Brazil for the delay and attendant expenses, shows that they regarded the gov-ernment as responsible for it, and did not attribute it to the con-signees.

We conclude that the libelants have failed to establish such a de-fault on the part of the charterers as entitles them to a recovery for the detention.

The decree is reversed with costs, and with instructions to dismiss the libel.