UNITED STATES SHIPPING CO. v. UNITED STATES.

(Circuit Court, D. New Jersey. July 11, 1906.)

1. ADMIRALTY—JURISDICTION—SUIT AGAINST UNITED STATES.

Admiralty jurisdiction in a suit in personam is not dependent on a right to proceed in rem. but upon the subject-matter of the suit, and a suit against the United States, brought under the provisions of Act March 3, 1887, c. 359, 24 Stat. 505 [U. S. Comp. St. 1901, p. 752], and based upon a maritime contract of affreightment, is within the admiralty jurisdiction of the Circuit or District Court.

[Ed. Note.—For cases in point, see vol. 1, Cent. Dig. Admiralty, §§ 131–149, 185–190.]

2. SHIPPING—CONSTRUCTION OF BILL OF LADING—TIME FOR DISCHARGING.

A provision of a bill of lading that the cargo shall be "received by the consignee immediately the vessel is ready to discharge, and continuously at all such hours as the customhouse or port authorities may give permission for the ship to work," means only that the discharge shall be reasonably continuous, considering the time, place, and circumstances, the nature of the cargo, the situation of the vessel, and prevailing conditions generally.

3. SAME—DEMURRAGE.

Libelant contracted with a naval officer of the United States to carry ammunition and naval stores from the Brooklyn Navy Yard to the naval station at Cavite, Philippine Islands, to be there received, and immediately and continuously discharged by the consignee. A state of war prevailed in the Islands at the time, Cavite was not a port of entry, but merely a naval and military station, and owing to the nature of the cargo and the prevailing conditions the regulations required it to be discharged only in the daytime by means of government lighters, and that no more should be discharged in a day than could be deposited in the arsenal on shore the same day. Held, that all such conditions which were known to the parties rendered the regulations reasonable, and must be presumed to have been contemplated by the parties; that the United States was not liable for demurrage because of delay in discharging, in so far as it was carried on with reasonable dispatch under such regulations, but that it was liable for delay due to the failure to keep all of the lighters engaged in the work in use during

such hours as they might have been, and transferred their cargoes to the arsenal before night.

[Ed. Note.—Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46. C. C. A. 4.]

4. SAME—MEASURE OF RECOVERY.

In the absence of contract, the charter price per day of a vessel under a time charter is not the measure of demurrage recoverable for delay in discharging cargo taken by the charterer for another, but rather the probable net earnings of the vessel during the time lost in the usual course of its employment.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 593.]

Wing, Putnam & Burlingham and Henry E. Mattison, for petitioner.

John B. Vreeland, U. S. Dist. Atty., and H. P. Lindabury, Asst. U. S. Dist. Atty.

CROSS, District Judge. The petitioner, a time charterer of the steamer Trunkby, has filed a petition against the United States of America to recover demurrage of the amount of $1,702.75, which is alleged to have been caused by the detention of said vessel at Cavite, Philippine Islands, by the respondent in the month of June, 1900. The petitioner is a corporation organized under the laws of the state of New Jersey, and in bringing this suit is taking advantage of the jurisdiction conferred upon this court by the act of March 3, 1887, c. 359, 24 Stat. 505 [U. S. Comp. St. 1901, p. 752]. The action is in the nature of a suit in admiralty, and the petitioner prays that the cause may be proceeded with according to the rules of admiralty.

By the act I am required to file a written opinion in the cause, setting forth a specific finding of the facts therein, and also my conclusions upon questions of law involved.

## Finding of Facts by the Court.

The Trunkby was owned by R. Ropner & Co., and was under a time charter to the petitioner. The vessel was 200 feet long, 45 feet broad, and 20 feet deep; her tonnage was 1668 net, and a dead weight capacity of 4,065 tons. She had six hatches—four large and two small—besides engine-room space. Each large hatch was 24x12 feet. She was also provided with steam derrick and hoisting apparatus, working on either side of the vessel, but there was only room for two lighters to work on each side. The Trunkby first went to Baltimore, where she loaded 2,300 tons of steel rails for Vladivostock, distributed between holds No. 2 and No. 3, and about 100 tons more in holds Nos. 3 and 4. These rails were for railroad use, of the usual length and weight, and were stowed in the bottom of the holds. The vessel then proceeded to New York, where she loaded a little over 3,000 bales of cotton, weighing 600 or 700 pounds each, for Yokohama. Three hundred and fifty bales were stowed in hold No. 4 and the balance in No. 2. The ammunition and naval stores were placed in holds Nos. 1, 3, and 4. This space was engaged March 21, 1900, by Ed-

win Putman, storekeeper of the New York Navy Yard, for and on behalf of the naval department. He entered into a contract with the petitioner through John R. Livermore, a freight broker of New York, for carriage on board the Trunkby from New York to Manila, or port or ports, from 300 to 400 tons of ammunition and from 600 to 700 tons of naval stores. The agreement provided for the use of the regular Eastern form of bill of lading. On March 31st, under this agreement, there was loaded at New York 1,108,347 pounds of stores and 760,921 pounds of ammunition to be delivered to the general storekeeper at the naval station of Cavite, Philippine Islands, as per bills of lading. These bills of lading provided as follows:

"(6) Also, that the goods are to be received by the consignee immediately the vessel is ready to discharge, and continuously at all such hours as the customhouse or port authorities may give permission for the ship to work, if necessary, to discharge into lighters at the risk and expense of the consignee. And it is expressly understood that the articles named in this bill of lading shall be at the risk of the owner, shipper, or consignee thereof as soon as delivered from the tackles of such steamer at her port of destination, and they shall be received by the consignee package by package, as so delivered, and, if not taken away the same day by him, they may, at the option of the vessel's agent, be sent to store or warehouse, or permitted to lie where landed, at the expense and risk of the aforesaid owner, shipper, or consignee, and be subject to rent."

And in another paragraph it was provided "that the carrier shall have liberty to convey goods in lighters to and from the ship at the risk of the owners of the goods."

The Trunkby arrived at Manila June 4, 1900, and reported its arrival to the naval officials, and received orders to proceed to Cavite, whither the vessel proceeded, and anchored at 2:30 p. m. June 5, 1900, the master reported the readiness of the vessel to discharge cargo, and obtained permission therefor from the customhouse officials, who placed an officer on board to permit the discharge of cargo at all hours. The master engaged stevedores before leaving Manila. The master, from Cavite by military telegram, ordered the stevedores sent for. The telegram went through the following day. The stevedores consisted of four gangs and a foreman, 34 to 40 men in all. They were furnished by Robinson & McCondray. The stevedores went on board the Trunkby June 6th at evening, and began to discharge cargo June 7th. It was the custom to discharge the ammunition and naval stores from the steamer into government lighters. These lighters were under military guard. The lighters were towed out to the ship, which owing to shallow water was anchored at about one mile from the shore, and when loaded were towed ashore. Other than government lighters were not permitted to be used in the discharge of the cargo. This was by general regulation. An oral request to permit the steamer to employ other lighters was made, but it does not appear to whom, and was refused. Cavite was not a port of entry. All the freight consigned there at this time and for some time previously was for government use. There were no written or printed regulations existing as to the manner of unloading ammunition and naval stores, but, owing to the condition of war and insurrection then

existing, such freight could only be unloaded under government direction, in government lighters, and no more could be taken ashore on any one day than could be stored away in the arsenals at night. When such freight was taken from the lighters to the shore it had to be carried by hand some 200 yards to the arsenal. The discharge of the Trunkby proceeded as follows: June 7th four lighters came to the vessel. Work was stopped at 11:30 a. m., owing to the breaking down of the donkey feed pump. June 8th three lighters came to the ship. The work at No. 1 hatch stopped at 2 p. m., and at Nos. 3 and 4 at 4 p. m., after which no more lighters came out that day. On June 9th work was resumed at 8 a. m. in holds Nos. 1, 3, and 4. One lighter at each hatch. Lighter at No. 3 was loaded at 11:30 a. m., No. 1 at noon, and No. 4 at 2:15 p. m., after which no more lighters came out that day. June 10th, Sunday. June 11th work began with one lighter for each hold at 7 a. m. Lighters at Nos. 1 and 4 hatches were loaded at noon, and the lighter at No. 3 at 3 p. m., after which no more lighters came to the vessel that day. June 12th work was resumed at 6 a. m. in No. 1. Ammunition in that hold finished at 11:30. At 7 a. m. lighter was obtained for ammunition in No. 3 hold, and it was loaded at noon. Another ammunition lighter came out at 4 p. m. Work ceased at 5 p. m. The lighters all went ashore. June 13th work resumed at 7:30 a. m. Two lighters began loading with ammunition from No. 3 hold, and finished at 12:30. Two lighters loaded with naval stores from No. 1 hatch at 2 p. m. Another lighter came at 2 p. m. to take naval stores from No. 3 hold, and work ceased at 4:45 p. m. June 14th two lighters came for ammunition at 7:30 a. m.; loaded at 3:30 p. m. One lighter loaded with naval stores from No. 3 hold at 5 p. m., and two lighters were loaded with naval stores from No. 1 hold at 4:30 p. m. June 15th two lighters came alongside 7 a. m., one for ammunition at No. 3 hold, and one for naval stores at No. 1. The ammunition lighter was loaded at 10:15 a. m.; another, which arrived at noon, was loaded at 4 p. m. All the ammunition was then out, and another lighter was loaded with naval stores until 5 p. m. Two lighters alongside of No. 1 hatch were loaded with naval stores from 7 a. m. to 4 p. m. On June 16th two lighters came alongside at 7:45 a. m., took naval stores from hatches Nos. 1 and 3. At 11 a. m. two more lighters came, and at noon another; work stopped at 4:30 p. m. June 17th, Sunday. June 18th two lighters worked at hatches Nos. 1 and 3. At 10 a. m. two more lighters came, and another at 2 p. m.; finished No. 3 hold at 4 p. m.; stopped work at 4:30 p. m. On the 19th the cargo was entirely discharged at 8:30 a. m. The master of the Trunkby endeavored to accelerate the discharge, but was answered by the paymaster at the station that he was sorry, but could not do anything. The master protested against the delay. June 16th master noted a protest before the British consul of the delay in removing the cargo from ship, and on same day made claim on the commandant for four and one-half days demurrage, at £50 sterling per day. June 18th the master sent a letter to the ship's agents, claiming demurrage for seven days, and requesting the agents to make claim for that time. Accordingly, on June 19th, a claim was made upon the commandant through the

agents for two and one-half days additional demurrage, or seven days in all, making a total amount of demurrage claimed £350 sterling. The Trunkby sailed as soon as discharge was completed. June 23d Lieutenant Commander Irwin sent a letter to the agents, stating that delay was due to faulty storage, and that the claim for demurrage was considered unwarranted, but would be referred to Navy Department at Washington. June 29th the commandant sent a letter to Messrs. Kerr & Co., the agents, in which he referred to the master's letter of June 16th, and then stated that, as the delay in discharging was due to faulty storage of the cargo, and the stormy weather prevailing during the last few days of the discharge, there appeared to be no ground for the claim for demurrage. The last three days of the discharge, 16th, 17th, and 18th of June, were very rainy and windy, and very little work, if any, could be done; otherwise than as above, the weather was good. The stevedores remained on board the vessel all the time, but were unable to work at night. There was nothing on the part of the customhouse officials, stevedores, or crew that prevented work in discharging cargo during the daytime. The excuse made on the part of the government and set up in the answer, that the delay in discharging the vessel was caused by stormy weather and faulty storage of the cargo, is not sustained by the evidence, except that it was very stormy the last three days of the time, as above stated, and that consequently little work could be done on those days. Under ordinary conditions, it would have taken from four to five days to discharge the cargo. The captain says that it would have taken only four days to unload at Manila; that it required a much longer time to unload at Cavite than at Manila; that was the general experience among shipping people; that cargo that could be unloaded at Manila in four days would take about three times as long to unload at Cavite; and further, that if he had cargo that he could unload at Manila in four days, it would take twelve days to unload the same cargo at Cavite; that this difference was not due to anything in the anchorage or facilities at Cavite, but simply because the cargo was naval stores. During the discharge of the cargo, the captain was told that the reason for not discharging the cargo in the afternoons was because the officials didn't want the powder to stay in the lighter at night; they were afraid of its getting damp; and also because it was war time, and they were afraid the Filipinos might see the lighters loading, watch them leave the vessel, and try to set fire to the lighters during the night. No general merchandise whatever was discharged at Cavite during this period; all that was discharged there was for the government. The captain also testifies in answer to the question, "Why didn't you unload the material yourself, at your own risk?" That it was impossible; it was not allowed. And in answer to the question, "Did you try to unload it yourself?" answered, "No, sir; I didn't try; I never thought of it; I knew it was not allowed"; and says that he never thought of it because it could not be done. At the time of the discharge war prevailed, and precautions were taken by the government to prevent the destruction of the cargo by the enemy or injury from the weather, and it was these

conditions which prevented the discharge within the time requisite under ordinary conditions. The government regulations in the above respects were strict, and the discharge of the ammunition was the chief cause of the delay, since the government officials would not receive more from the steamer than could be stored in the magazine or arsenal the same afternoon. The general regulations in force required ammunition to be discharged between 6 a. m. and 5 p. m., and it had to be handled carefully and by daylight. A verbal request made to the authorities to allow lighters other than the government's to aid in the discharge was refused. A negative answer was brought back by the stevedores employed in the discharge, but it does not appear who received the request or gave the reply. This is the only direct testimony upon the point. There are several witnesses who assumed that the government, following its general custom, would not permit it, upon which reliance was placed, and not upon positive refusal. The party with whom the contract was made by the master for stevedores testified (and his testimony is uncontradicted) that he discharged many vessels at Cavite, and that he always acted under the direct instructions of the commandant of the naval station in making such discharge.

### Conclusions of the Court upon the Questions of Law Involved.

The respondent claims that, inasmuch as the petitioner has proceeded in this cause in personam and not in rem, the admiralty jurisdiction conferred by the statute cannot be invoked, and the petitioner must proceed as at common law. Under the act no decree in rem could be entered against the United States, and any judgment or decree entered must necessarily, therefore, be a personal one. The whole proceeding is controlled by the statute. It is not necessary that a maritime lien should exist giving a right to proceed in rem in order to confer admiralty jurisdiction. The existence of admiralty jurisdiction in a suit in personam is not dependent upon the existence of a right to proceed in rem, for jurisdiction depends, not upon the existence of a maritime lien, but upon the subject-matter of the contract. Boutin v. Rudd, 82 Fed. 685, 27 C. C. A. 526. The rule is well settled that the test of admiralty jurisdiction in contract cases is their nature and subject-matter. Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90. The contract in this case is one of affreightment; this is not disputed. Contracts of this character are matters of admiralty jurisdiction. Lands v. Cargo of Coal (D. C.) 4 Fed. 478; The Monte A. (D. C.) 12 Fed. 331; The San Fernando v. Jackson (C. C.) 12 Fed. 341; Dunbar v. Weston (D. C.) 93 Fed. 472; Insurance Co. v. Dunham, supra. The statute above referred to directs the Circuit Courts to follow the rules of courts having admiralty jurisdiction. The petition sets forth a maritime contract, and one over which an admiralty court would have had undoubted jurisdiction if the United States were not a party; but, as the United States is a party, it became necessary to invoke the aid of the statute, and the jurisdiction thereby conferred upon this court to proceed after the manner of admiralty. The action can therefore be maintained under the statute.

It will be observed that there is nothing in the bills of lading stipulating as to lay days or demurrage. The only stipulation relating to the discharge of the freight is that it is to be "received by the consignee immediately the vessel is ready to discharge, and continuously at all such hours as the customhouse or port authorities may give permission for the ship to work, if necessary, to discharge into lighters at the risk and expense of the consignee." It is obvious that the word "continuously" is not to be considered as synonymous with incessantly or uninterruptedly. It would be impossible that the cargo should be discharged from the hold of the vessel over its sides into lighters without cessation, as a stream of water can be made to flow from an open faucet. No such construction was put upon the word by the parties at the time, much less by the petitioner. Such a construction would have required the work to proceed by night and by day; but it appears by the petitioner's own testimony that the stevedores who were employed by the master of the vessel could not work at night. The clause means no more, then, than that the discharge should be reasonably continuous, considering the time, place, and circumstances, the nature and character of the cargo, the situation of the vessel, and prevailing conditions generally. In the absence of express agreement as to the time for unloading, actions of this character are maintained upon the theory that there is an implied contract to discharge the cargo in a reasonable time, and what constitutes reasonable time depends upon the circumstances of the particular case, the facilities for discharge at the port where the discharge is to be made, the nature of the cargo, the weather, etc. In the case of Empire Transportation Co. et al. v. Philadelphia & R. Coal & Iron Co. (C. C. A.) 77 Fed. 919, 925, 23 C. C. A. 564, 35 L. R. A. 623, the court lays down certain propositions as follows:

"(1) Where the charter of a ship is silent as to the time of unloading and discharge, there is no implied agreement that the charterer will unload or discharge her in the customary time at the port of delivery, regardless of all extraordinary circumstances and unforeseen obstacles.

"(2) The implied contract is to unload and discharge her in such time as is reasonable, in view of all the existing facts and circumstances, ordinary and extraordinary, legitimately bearing upon that question at the time of her arrival and discharge.

"(3) This implied contract to discharge the vessel in a reasonable time is, in effect, a contract to discharge her with reasonable diligence.

"(4) The burden is on him who seeks to recover damages for the delay of a vessel under such a contract to prove that the charterer did not exercise reasonable diligence to discharge her, under the actual circumstances of the particular case.

"(5) Proof that the vessel was delayed in unloading beyond the customary time for unloading such cargoes at the port of her delivery throws upon the charterer the burden of excusing the delay by proof of the actual circumstances of the delivery and his reasonable diligence thereunder."

See, also, Uren v. Hager (D. C.) 95 Fed. 493; Fish v. One Hundred and Fifty Tons of Brown Stone (D. C.) 20 Fed. 201; Morgan v. Garfield, etc., Co. (D. C.) 113 Fed. 520; Donnell v. Amoskeag Manfg. Co., 118 Fed. 10, 55 C. C. A. 178; Burrill et al. v. Crossman et al., 130 Fed. 763, 65 C. C. A. 189; Merritt & Chapman Derrick & Wrecking Co. v. Vogeman (D. C.) 143 Fed. 142.

The bills of lading in this case called for a shipment of naval stores and ammunition; the latter consisting of fuses, powder, shells, etc., from the Navy Yard at New York to Cavite, Philippine Islands. Cavite was not a port of entry, but was a naval and military station, in the possession and control of the respondent.  A state of war and insurrection existed in the Islands at the time.  There were no written or printed regulations existing when the vessel arrived at Cavite as to the discharge of ammunition and naval stores, but certain well understood regulations were nevertheless in force, among which were that the discharge was to be made into government lighters only, between certain hours of the day, and that no more of such cargo would be received from the vessel on any one day than could be deposited in the arsenal or magazine on shore the same day.  These precautions were considered necessary in view of the state of war and insurrection then and there existing.  That they were, under the circumstances, reasonable and necessary, scarcely admits of question, but, conceding this, were they in any degree binding upon the petitioner?  It was matter of common knowledge at the time that the Philippine Islands were in a state of insurrection, and that Cavite was not a port of entry, but only a naval station; furthermore, the petitioner knew of the character of the cargo, that it was being shipped from one naval post to another, and from certain naval officials of the government to certain other like officials.  These facts were undoubtedly in the minds of the parties, and were given consideration when the contract of affreightment was made, and might properly, for that reason, be given some consideration in its interpretation; but, aside from that, they must be given weight in determining whether either party was in default in its execution.  They are a part of the facts, circumstances, and conditions which show or tend to show whether or not the discharge of the vessel was accomplished with reasonable expedition.  The cargo to be unladen from the Trunkby was no ordinary cargo, which could be thrown or dumped out in any haphazard way, anywhere, in any kind of weather, by day or by night, and regardless of whether the consignee or any person representing him was present to receive it.  It must be guarded, cared for, and kept from the enemy at all hazards, and all reasonably necessary precautions in this direction had to be taken, and so long as they were reasonably necessary and reasonably carried out they bound the petitioner.  The bills of lading and the whole transaction must be construed with direct reference to the considerations above presented.  If, in the absence of contract, what constitutes reasonable time in the discharge of a cargo is ordinarily determinable by the circumstances of the particular case, the nature of the cargo, and the conditions and customs prevailing at the port of discharge, then this more so.  The sixth paragraph of the petition is as follows:

"The custom of discharge of ammunition and naval stores was to take the goods from the steamer into government lighters or barges, which were always under military guards, who maintained close custody of the same till those lighters had been towed ashore, whence the ammunition and stores were disembarked from the lighters into the government arsenal."

The petition then goes on to complain that the government officials did not have sufficient men or lighters to discharge the cargo with good dispatch, and that the few lighters that they had were not sent out promptly. The custom of the government with respect to the discharge of military supplies is here recognized. The evidence shows that the military regulations pertaining thereto were known to the agents of the petitioner at Cavite, and to the other witnesses residing or stationed there. Under the circumstances, I think the regulations were reasonably necessary, and were reasonably to be anticipated by the petitioner. Notwithstanding this, it plainly appears that the government lighters were not kept so steadily at work or for so many hours daily as the regulations permitted. The facts above appearing relating to the discharge of the vessel, the number of lighters daily engaged therein, and the hours they were severally occupied, are taken from the log-book, fortified by the testimony of the master of the Trunkby, and, in the absence of other testimony, must be accepted as fairly accurate. A consideration of this testimony satisfies me that, everything considered, the discharge of cargo was not made as expeditiously as it reasonably might have been. An analysis of the testimony shows that the work seldom began as early in the day or continued as late as it might under the regulations, nor were all of the government lighters kept busy. The log shows that on two or three of the days five lighters came out, and on others a less number. What was accomplished on some days is a fair indication of what might apparently have been accomplished on other days, since the weather was fine except during the last three days of the discharge. There is practically no testimony submitted on the part of the government. Commander Cowles was sworn on its behalf, but his testimony shows that he had very little personal knowledge of the transaction. He did say, however, that the regulations in force at the time required ammunition to be discharged between 6 a. m. and 5 p. m., and that it had to be handled carefully and by daylight. In view of the case made by the petitioner, it was incumbent upon the respondent to show that it discharged the cargo as fast as it reasonably could, under the circumstances, conditions, and regulations existing. This has not been done, and the defenses particularly set up in the answer are not supported by any evidence. Considering the case as presented, I think that damages in the nature of demurrage should be allowed; not, however, for seven days, as claimed, but for a period of three days.

I have reviewed the testimony carefully, and in my opinion it does not disclose—certainly not with definiteness—that the discharge could have been completed, under the circumstances, more than three days sooner than it was. It is true witnesses say that it might have been completed under ordinary conditions in four or five days. On the other hand, the captain says that it would have taken three times as long to discharge the cargo at Cavite as at Manila, but his testimony must, in fairness, evidently be restricted to the discharge of this particular cargo, since he had never been at Manila or Cavite before. Damages by way of demurrage for three days will be allowed, and such allowance will cover, in my judgment, all that the petitioner can

reasonably ask. Damages have been claimed for each day's delay equal to the charter price of the vessel per day. This, however, does not seem to be the true measure of damages. It should rather be the probable net earnings of the vessel during the period of delay. This can be ascertained by finding the gross freight which it would under ordinary circumstances, in the usual course of its employment, have earned, and deducting therefrom what it would have expended in earning it. Sheppard et al. v. Philadelphia Butchers' Ice Co., Fed. Cas. No. 12,757. There is nothing to show that the vessel would have earned anything if free.

A reference will be made to a commissioner to ascertain and report the amount of damages which should be allowed the petitioner for the period above mentioned.