## THE GILBERT KNAPP.

### MYGATT et al. v. THE GILBERT KNAPP.

*(District Court, E. D. Wisconsin. January 7, 1889.)*

1. ADMIRALTY—JURISDICTION—CONTRACT WITH STEVEDORE.
    A claim for services rendered by a stevedore in loading or unloading a vessel is a maritime contract, within the principles of admiralty jurisdiction.
2. MARITIME LIEN—SERVICES OF STEVEDORE IN HOME PORT.
    But no lien on the vessel is allowed in admiralty for such services rendered in the home port.
3. SAME—BREACH OF CONTRACT.
    The breach of an executory contract with a stevedore to unload a vessel at her home port is within Rev. St. Wis. § 3348, subd. 3, giving a lien on vessels "for all demands or damages accruing from the non-performance or malperformance of * * * any contract touching the transportation of persons or property," etc.
4. SAME—WAIVER OF CONTRACT.
    Libelants claimed a contract to unload four cargoes. The making of such contract was denied. When about to unload the third, they were prevented by respondents, who had hired another gang for that purpose. All parties finally went to the managing owner, where it was agreed, as a peace measure, that libelants should unload that cargo, and that the rival gang should be allowed to unload the fourth. *Held* that, if libelants had any contract to unload all four cargoes, they waived it by the new agreement.

In Admiralty. Libel by Beauregard Mygatt and Ellis Leas against the schooner Gilbert Knapp, for damages for breach of contract to unload cargo.

*O. T. Williams,* for libelants.

*Charles Quarles,* for respondents.

JENKINS, J. In the noted case of *De Lovio* v. *Boit,* 2 Gall. 398, an action *in personam* upon a marine policy of insurance, decided in 1815, that eminent jurist, Judge STORY, delivered an elaborate opinion concerning the jurisdiction of the admiralty. In a masterly review of the decisions of the English common-law courts seeking to restrict that jurisdiction, he showed them to be irreconcilable with any just conception of the admiralty jurisdiction. He challenged the limitation applied by those courts that jurisdiction extended only to causes of action arising "from things done upon the sea," and asserted the true limitation to be "to things pertaining to the sea." He held that the delegation by the constitution to the judicial power of the United States of all cases of admiralty and maritime jurisdiction "comprehended all marine contracts, whether made or to be executed on land or sea, which relate to the navigation, business, or commerce of the sea." This doctrine was not finally established by the ultimate judicial authority without conflict. It encountered censure and opposition from both bench and bar. Chancellor Kent, (1 Kent. Comm. 370, note,) indeed, refers to insurance as a thing of settled admiralty jurisdiction; but no less an authority than Chief Justice TANEY, in *Taylor* v. *Carryl,* 20 How. 615, decided in 1857, characterized the

statement as too broad for the reason that the question of jurisdiction as asserted had never been brought to the supreme court for adjudication. Judge CURTIS, in *Insurance Co*. v. *Younger*, 2 Curt. 332, decided in 1855, follows Judge STORY, but intimates that from want of confidence felt by the bar in the ultimate establishment of the jurisdiction by the supreme court, the principles asserted had infrequently been called into action. He likewise suggested that *Cutler* v. *Rae*, 7 How. 729, decided in 1848, went far towards overruling the decision in *De Lovio* v. *Boit*, and was irreconcilable with some of its provisions. Mr. Justice CAMPBELL in *The Magnolia*, 20 How. 335, decided in 1857, speaks of Judge STORY's decision as a "broad pretension for the admiralty, under which the legal profession and this court staggered for thirty years before being able to maintain it." It was not until 1870, after 55 years of contention, that the precise question was presented to the supreme court in *Insurance Co*. v. *Dunham*, 11 Wall. 1. Then, by the unanimous concurrence of the judges, the position of Judge STORY was fully sustained as declaring the correct principle of admiralty jurisdiction. It was then finally determined that the true criterion of admiralty jurisdiction as to contracts "is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions;" and the court observes that whether contracts are maritime or not depends, not on the place where made, but upon their subject-matter. This, says the court, is to be regarded as established doctrine.

Within the principle so recognized, and now beyond contention, can a claim for the services rendered by a stevedore in lading the ship or discharging cargo be deemed a maritime contract? The service was formerly done by and as part of the duties of mariners. The necessities of a developed and swelling commerce have superseded old methods, and have substituted a trained and skilled body of laborers, with a view to safe storage and prompt delivery of cargo, and the speedy dispatch of the ship. The service is essential to enable the ship to earn freight,—the sole object for which the ship is constructed and navigated. The contract of affreightment is confessedly maritime. Why are not services performed in fulfillment of the maritime contract equally maritime? The lading of the vessel or delivery of cargo upon the wharf is as essential an element of the contract as the carriage by sea. Freight cannot be earned without delivery. *Ex parte Easton*, 95 U. S. 75. It is well said by Mr. Benedict (Ben. Adm. § 285) that delivery is the "crowning act of maritime commerce, for which all others labor, and to which all other acts are subordinate, on which the right to freight depends, and which is in fact the great purpose, and the only ultimate purpose, of a ship." All acts, therefore, proper to be done in fulfillment of maritime contracts, must be of a maritime nature, because done with respect to "things pertaining to the sea," and constituting part of the service contemplated by the maritime contract. They "have reference to maritime service and to maritime transactions." They are services "touching rights and duties appertaining to commerce and navigation." The admiralty has cog-

nizance of matters on land, if they are incidents to those at sea. *The Fanny*, 2 Pet. Adm. 309, 324. It has been supposed that the weight of authority was in antagonism to the maritime nature of the service under consideration. This, at the present time, cannot be conceded. A careful scrutiny of the cases opposed will disclose that the decisions were based upon grounds in conflict with subsequent rulings of the court of last resort. Some of them are in opposition to the expressed views of the judges who rendered the decisions; others are bottomed solely on precedent now deemed obsolete, and in conflict with modern principles, and must fall with the authority cited to sustain. The dates of these decisions, with reference to the date of the ruling in *Insurance Co.* v. *Dunham*, it is essential to observe. The cases denying the maritime character of the stevedores' services are: *The Amstel*, Blatchf. & H. 215, decided in 1831; *The Joseph Cunard*, Olcott, 120, decided in 1831; *Cox* v. *Murray*, 1 Abb. Adm. 341, decided in 1848,—these three decisions being by Judge BETTS of the Southern district of New York; *The S. G. Owens*, 1 Wall. Jr. 370, decided in 1849; *The Circassian*, 1 Ben. 209, decided in 1867; *The A. R. Dunlap*, 1 Low. 361, decided in 1869; *The Ilex*, 2 Woods, 229, decided in 1876; *Hubbard* v. *Roach*, 2 Fed. Rep. 393, decided in 1880; *The E. A. Barnard*, Id. 712, decided in 1880; and *The Ole Oleson*, 20 Fed. Rep. 384, decided in 1884. In *The Circassian*, Judge BENEDICT expressed a decided opinion in favor of the maritime nature of the contract for such services rendered, but, counter to his own judgment, felt himself bound by the ruling of Judge BETTS in *The Amstel*, *The Joseph Cunard*, and *Cox* v. *Murray*. *The A. R. Dunlap* likewise followed the ruling of Judge BETTS, although his reasoning was pronounced unsatisfactory by Judge LOWELL in deciding the case. Judge LOWELL subsequently, in *The George T. Kemp*, 2 Low. 477, decided in 1876, expressly overruled *The A. R. Dunlap*, refused longer to follow the doctrine of Judge BETTS, and asserted the maritime nature of the contract. *Hubbard* v. *Roach*, and *The Ole Oleson*, were ruled by my learned predecessor contrary to his own convictions, as he declares in the last-named case, and in obedience to supposed weight of authority. *The S. G. Owens* was decided by Mr. Justice GRIER, at the circuit, in 1849, pending the conflict touching the correctness of the principles asserted by Judge STORY. Mr. Justice GRIER considers that the service of a stevedore is in no sense maritime, being done before or after the completion of a voyage, and therefore follows the rulings of Judge BETTS. It is important to observe, as indicative of the general views of admiralty jurisdiction then entertained by Mr. Justice GRIER, that he dissented from the opinion of the supreme court in *Navigation Co.* v. *Bank*, 6 How. 344, holding that contracts of affreightment are maritime. If contracts of affreightment are not maritime, it would follow logically that services rendered in fulfillment of such contracts were also not maritime. The decision in *The S. G. Owens* was therefore a logical result of the mistaken views then held by that distinguished jurist. It is gratifying, however, to know that in the subsequent case of *Morewood* v. *Enequist*, 23 How. 493, decided in 1859, Mr. Justice GRIER affirmed in vigorous language the maritime

nature of contracts of affreightment, and, as is said by Mr. Justice BRAD-
LEY in *Insurance Co.* v. *Dunham, supra,* appeared to have changed his views
on the whole subject. It may well be doubted if Mr. Justice GRIER would
have ruled in 1859 as he did in 1849. The case is shorn of its authority,
being founded upon views of maritime contracts now confessedly errone-
ous. The decision in 1880 in *The E. A. Barnard* is placed upon grounds of
consistency with the uniform practice in the Eastern district of Pennsyl-
vania, founded, doubtless, upon the ruling in *The S. G. Owens.* Judge
BUTLER, rendering the decision, claims to be in accord, although citing
none, with all the American cases, with the exception of *The George T.
Kemp,* but fails to refer to *The Windermere* and *The Senator, infra,* holding to
the contrary, possibly not then published. Judge BUTLER intimates that
the doctrine is not satisfactory, and bases his decision mainly upon the
ground that the service was rendered at the home port of the vessel, and
therefore no lien attached under the twelfth rule in admiralty. In this re-
spect the decision may be upheld. That ground is considered further on.
*The Ilex* was ruled solely upon the authority of Judge BETTS and Mr. Jus-
tice GRIER. Mr. Justice BRADLEY, who delivered the opinion, held the
question foreclosed by these decisions. He evidently had not considered
the subject upon its merits, for he observes, with respect to the argu-
ments of Mr. Justice GRIER, that they "are so clear and forcible that I
am not certain that I should come to a different conclusion if the ques-
tion were a new one." It may be mentioned as passing strange that Mr.
Justice BRADLEY should have so readily yielded to the views of Mr. Jus-
tice GRIER, since he delivered the opinion in *Insurance Co.* v. *Dunham,*
to the effect that the maritime nature of contracts depended, not on the
place where made, but on their subject-matter,—as to whether they had
reference to maritime transactions,—with which view Mr. Justice GRIER
was not in accord. He probably overlooked the mistaken views of mari-
time contracts entertained by Mr. Justice GRIER at the date of the decis-
ion of *The S. G. Owens,* and of the decided change of his views as an-
nounced by him in *Morewood* v. *Enequist,* in 1859, 10 years after the
decision in *The S. G. Owens,* to which Mr. Justice BRADLEY alludes in
*Insurance Co.* v. *Dunham.*

It may therefore fairly be said that the decisions denying the mari-
time nature of a stevedore's contract all rely upon the views expressed
by Judge BETTS in *The Amstel,* and with one exception follow with-
out indorsing them. "It is but one decision, of which the others are the
echoes." Judge BETTS denies that delivery of cargo is in any sense a
maritime service because performed partly on board and partly on shore
after voyage ended. He asserts that the gist and foundation of the action
in the admiralty is the marine service. In 1832, in *The Gold Hunter,*
Blatchf. & H. 300, the same learned judge cites approvingly the case
of *De Lovio* v. *Boit,* and asserts that subjects of a maritime nature are
things done upon or in relation to the sea; "in other words, all transac-
tions and proceedings relating to commerce and navigation." He de-
clares the maritime nature of contracts of affreightment and bills of lad-
ing because they concern transportation by sea, "and the whole service

and consideration contemplated by the parties to it relate to navigation and to maritime employment." He says that the transaction is one of navigation and commerce on navigable waters, and is subject to the cognizance of a court of admiralty, whether entered into on land or on water.

If, then, the contract of affreightment be maritime, I confess my inability to comprehend why services essential to the fulfillment of a maritime contract are not also maritime. Delivery is part of the service contemplated by the parties to the maritime contract of affreightment, and relates to maritime employment, and, as I conceive, comes within the ruling in *The Gold Hunter*. Naturally, therefore, we find that the decision of Judge BETTS in *The Amstel* and kindred cases is no longer controlling within the district in which he presided. *The Windermere; The Hattie M. Bain;* and *The Scotia, infra*. With the exception of *Hubbard v. Roach* and *The Ole Olesen*, in which Judge DYER repudiates the principles of the decisions considered, all the cases save *The Ilex*, and *The E. A. Barnard*, were decided before the deliverances of the supreme court in *Insurance Co.* v. *Dunham*. As to those two, *The Ilex* merely followed the prior decisions, without consideration of the principles then lately established by the supreme court, and without expression by Mr. Justice BRADLEY of his own views upon the subject. *The E. A. Barnard* likewise followed the older decisions, somewhat under protest, and without consideration of later and controlling authority. The maritime character of the service has been sustained in *The Williams*, 1 Brown, Adm. 225, decided in 1873; The *George T. Kemp*, 2 Low. 477, decided in 1876; *The Senator*, 21 Fed. Rep. 191, decided in 1876; *The Windermere*, 2 Fed. Rep. 722, decided in 1880; *The Canada*, 7 Fed. Rep. 119, decided in 1881; *The Hattie M. Bain*, 20 Fed. Rep. 389, decided in 1884; *The Scotia*, 35 Fed. Rep. 916, decided in 1888; and *The Wyoming*, 36 Fed. Rep. 495, decided in 1888. All of these cases were subsequent in point of time to *Insurance Co.* v. *Dunham*, are largely based upon the principles thereby established, and are the logical result of and accord with the broad and comprehensive spirit of that decision. Analogous cases are not wanting. Thus in *The Kate Tremaine*, 5 Ben. 60, decided in 1871; *The J. H. Starin*, 15 Blatchf. 503, decided in 1879; *Ex parte Easton*, 95 U. S. 68, decided in 1877,—a contract for wharfage is held to be a maritime contract. In *The J. H. Starin* a libel *in rem* for cargo discharged and carted over the wharf, and to enforce lien given by state authority, was sustained, because "the use of the wharf pertains to navigation by water to such an extent that the implied contract for wharfage in respect of the goods, may properly be regarded as a maritime contract of benefit to the steamer," and held to be cognizable and enforceable in the admiralty. In *Ex parte Easton* it is asserted that accommodations at the port of destination are equally indispensable for the voyage as at the port of departure. Consignments of goods and passengers must be landed, else the carrier is not entitled to freight or fare. In *The Emily Souder*, 17 Wall. 666, decided in 1873, the court held that custom-house dues, consular fees, and charges for medical attendance upon the crew stood

in the same rank with necessary repairs and supplies to the ship. In *The Onore*, 6 Ben. 564, decided in 1873, the services of a cooper to put in landing order the cargo of the ship, and performed partly on the ship and partly on the wharf, were held to be maritime, "because they are a necessary part of the maritime service which the ship renders to the cargo, and without which the object of the voyage would not be accomplished." Likewise in *The River Queen*, 2 Fed. Rep. 731, decided in 1880, the weighing, inspecting, and measuring of cargo preparatory to its delivery were held to constitute a maritime service. And so, also, are the cases noted above, holding to the maritime nature of a policy of marine insurance, for that is a contract made on land, and to be performed on land. It derives its maritime nature solely from the fact that it deals with the risks of the sea. So the stevedore's contract deals with commerce and navigation, and has relation to the fulfillment of a maritime contract for carriage at sea. In *The Bob Connell*, 1 Fed. Rep. 218, a claim for lockage in a public navigable river was held to be of a maritime nature, and so cognizable by a court of admiralty. It seems clear, therefore, that the decided weight of authority concurs with the proper conception of the principles of the admiralty jurisdiction, in clothing the services of a stevedore in lading the ship or discharging cargo with the essentials of a maritime contract.

It does not necessarily follow, the contract being maritime, that a lien upon the vessel is allowed. The stevedore stands in no such relation to the ship as a mariner. He is neither bound to like control, subject to like liabilities, nor are his rights so peculiarly protected by statute. His services are not connected with the navigation of the ship. They are incidental to the execution of the maritime contract of carriage and delivery. He is not, strictly speaking, a material-man, but he stands on the same footing when he has rendered service necessary to the business of the ship. *The George T. Kemp*, 2 Low. 483. It is established law that material-men furnishing repairs and supplies to a ship in her home port do not acquire any lien by the general maritime law as received in the United States, notwithstanding the maritime nature of the contract. *The Belfast*, 7 Wall. 645; *The Lottawanna*, 21 Wall. 559; *Norton v. Switzer*, 93 U. S. 366. This proceeds upon the ground that the origin of the maritime lien for supplies and services is based upon the necessities of trading vessels visiting distant localities, where neither the master nor the owners have credit. Hen. Adm. § 43; *The St. Jago de Cuba*, 9 Wheat. 409; *The Lottawanna, supra*, 579. At the home port they are presumed to have been furnished upon the credit of the owner. In the cases cited to sustain the maritime nature of the services performed by stevedores, all, with the possible exception of *The Senator*, were for services rendered at a port to which the vessel was foreign. In that case the report does not disclose the fact, and no reference is made thereto. In *The E. A. Barnard* the lien was denied mainly because the services were rendered at the home port. *The George T. Kemp* expressly rules that the service, though maritime, gives no lien to a domestic vessel, unless by the state law. The twelfth rule in admiralty, adopted in 1859, limited proceed-

ings *in rem* to a foreign ship or a ship in a foreign port. As changed in 1872, it provided that "in all suits by material-men for supplies or repairs or other necessaries, the libelant may proceed against the ship *in rem*, or against the owner or master *in personam*." The notion prevailed that this change authorized material-men to proceed *in rem* against a domestic ship. In *The Lottawanna, supra*, the court held otherwise; that the rule was only intended to remove embarrassments as to proceedings *in rem*, where liens exist by law; and that the court had no power to create any new lien. See pages 579, 581. Therefore, although the contract be maritime in its nature, no lien attaches by the maritime law for services rendered at the home port of the ship. *Ex parte Easton*, 95 U. S. 75; *The Bob Connell*, 1 Fed. Rep. 218.

It is believed to be no longer doubtful that executory contracts, maritime in their nature, and within the master's authority, are within the scope of the admiralty jurisdiction. Whether or not for breach of such contract a remedy in the admiralty is given *in rem* as well as *in personam* has been the subject of conflict in the courts. It is unnecessary to consider that question here, since the highest authority determines that, although the state cannot grant jurisdiction to the admiralty, a state may give certain liens on ships for services or supplies in the home port, which the admiralty, the subject-matter being maritime, and within its jurisdiction, will recognize and enforce. *The Lottawanna*, 21 Wall. 558; *Weston* v. *Morse*, 40 Wis. 455. By Rev. St. Wis. § 3348, subd. 3, a lien is constituted on every vessel used in navigating the waters of Wisconsin "for all demands or damages accruing from the non-performance or mal-performance of any contract of affreightment, or any contract touching the transportation of persons or property entered into by the master, agent, owner, or consignee of the ship, boat, or vessel on which such contract is to be performed." Executory contracts are manifestly within the provision of this statute. *The J. F. Warner*, 22 Fed. Rep. 345. It covers the claim of a stevedore for breach of contract to unload a vessel. This conclusion compels an examination into the merits of the claim of the libelants.

The Gilbert Knapp was owned, one-third by her master, Michael Maloney, and two-thirds by Mr. Hazelton, her managing owner, both residents of Kenosha, the home port of the vessel. She arrived at Kenosha on the 17th day of May, 1888, with a cargo of lumber. At this time it is charged by the libelants that they contracted with the master to unload the cargo then in the vessel, and three other cargoes which the master stated the vessel had contracted to deliver at Kenosha, for a certain agreed price for the unloading of each cargo. They assert that under such contract they unloaded three cargoes, and were, without cause, forbidden and prevented from unloading the fourth, by the refusal of the master and owners to accept or allow performance of the contract. This is all denied by the respondents, who affirm that libelants were only employed upon each arrival of the vessel on the first three trips, to unload the particular cargo, and were not employed to unload the fourth cargo. Without entering into details of the evidence, it is satisfactorily established

that the contention of the respondents is correct. There are certain earmarks of the transaction which in the conflict of evidence seem decisive. Upon the unloading of the second cargo, according to the testimony of the captain, not controverted by the libelants, the latter refused to receive the alleged contract price for the work, as they were compelled, if any such contract had been made, but demanded a somewhat larger sum, which the master paid to avoid trouble. Such conduct is not in harmony with the pretension of previous contract at a fixed rate. Upon the arrival of the third cargo, as the vessel was making fast to the dock, a messenger with a note to the master from Mr. Hazelton boarded the vessel, and presented the message. This messenger belonged to another party of stevedores, and was there assaulted by the libelants and their men, and brutally used. There seem to have been two rival gangs of stevedores, one working at cheaper rates than the libelants. The latter undertook to inaugurate a forcible boycott, neither commendable nor lawful. The captain, upon receipt of the message, refused to permit the libelants to unload, and thereupon the master and representatives of the rival gangs proceeded to Mr. Hazelton's office, where, after much disputation, it was arranged as a peace measure that the libelants should unload the cargo then in port, and that the unloading of the next or fourth cargo should be given to their rivals. All parties united in this arrangement, in pursuance of which the libelants unloaded and were paid for the third cargo. If there had been a contract as claimed, its obligation was waived on the part of libelants by this new arrangement, and a new and substituted agreement made. Upon arrival of the fourth cargo, the libelants' gang of stevedores undertook to anticipate their rivals, and to unload the vessel without authority, and in breach of their arrangement. They were promptly stopped in their unlawful undertaking by the master, and the vessel was unloaded by the stevedores to whom, by the assent of all parties, the work had been committed. The claim of the libelants is unfounded and unjust.

In view of this conclusion upon the evidence it may be said that inquiry into the maritime nature of stevedores' services was unnecessary. Possibly that is so. It seemed essential, however, that the obviously correct views upon that subject entertained by my predecessor, Judge DYER, should hereafter have practical effect given to them in this district, and that they should not be throttled by a supposed weight of authority, which I think a critical examination of the cases does not disclose. At all events, the current of authority now is quite in accord with his expressed views. The rule, therefore, in this district will hereafter obtain as stated, until overborne by superior authority.

The libel will be dismissed, with costs.