**Stephen EDYNAK**

v.

**ATLANTIC SHIPPING INC. CIE. CHAMBON MACLOVIA S. A.**

v.

**ALLIED CHEMICAL COMPANY,**

**Atlantic Shipping, Inc., Appellant.**

No. 76–2293.

United States Court of Appeals, Third Circuit.

Argued May 3, 1977.

Decided Aug. 15, 1977.

216

Charles W. Craven, Marshall, Dennehey & Warner, Philadelphia, Pa., for appellant.

Avram G. Adler, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, ROSENN, Circuit Judge, and MEANOR,* District Judge.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

When Congress enacted the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 and thereby abolished the longshoreman's suit for unseaworthiness,[1] it hoped to reduce the litigation arising from longshoremen's personal injuries and to effect a saving of judicial resources.[2] The experience of this court indicates that, for two reasons, Congress' hope has yet to be realized: first, the unclarity of the 1972 amendments has generated litigation seeking interpretation of that legislation;[3] second, the unseaworthiness action remains available to those longshoremen who were injured prior to the enactment of the 1972 amendments.[4] The instant appeal is illustrative of the second reason, and presents several questions regarding the scope of the longshoreman's unseaworthiness action.

## I.

On December 9 and 10, 1971, Stephen Edynak, an employee of Allied Chemical Company ("Allied"), was working on board the *S.S. Ariana*, a vessel owned by appellant Atlantic Shipping Company ("Atlantic"). Edynak was functioning as a signalman, using a series of hand signals to coordinate and direct the movements of a pier-based crane as it unloaded the *Ariana's* cargo of fluorspar; because of the crane operator's remote, shore-side location in the crane's control cab, a signalman was necessary to serve as the operator's "eyes." The crane was owned, operated, and maintained exclusively by Allied, and the cargo being unloaded was also owned by Allied.

During the afternoon of December 10, Edynak signaled the crane operator to relo-

---

* H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1. Pub.L. No. 92–576, § 18(a), 86 Stat. 1263 (codified at 33 U.S.C. § 905(b) (Supp. V. 1975)). *See generally Hurst v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir. 1977) (sustaining constitutionality of congressional abolition of longshoreman's suit for unseaworthiness).

2. *See* H.R.Rep.No.92–1441, 92 Cong., 2d Sess. 5, *reprinted in* [1972] U.S.Code Cong. & Ad. News, 4698, 4702–03; S.Rep.No.92–1125, 92 Cong., 2d Sess. 9 (1972). The House Report specifically mentioned the impact of longshoremen's unseaworthiness actions on the caseload of the United States District Court for the Eastern District of Pennsylvania.

3. *See, e. g., Hurst v. Triad Shipping Co., supra*, 554 F.2d at 1244; *Maher Terminals, Inc. v. Farrell*, 548 F.2d 476 (3d Cir. 1977); *Dravo Corp. v. Maxin*, No. 75–2403 (3d Cir. Nov. 15, 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977); *Sea-Land Serv., Inc. v. Director*, 540 F.2d 629 (3d Cir. 1976). The Supreme Court's decision in *Northeast Marine Terminal Co. v. Caputo*, —— U.S. ——, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), has resolved many of the questions of statutory interpretation that had perplexed the courts of appeals.

4. *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 460 n. 1 (5th Cir. 1976); *see Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 107 n. 1, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).

cate the crane from the *Ariana's* number four hatch forward to her number three hatch. When Edynak looked into the number three hatch opening, he observed men working below. He placed his hands on the hatch coaming—the metal, chest-high wall surrounding the hatch opening—and waited for them to finish. The crane's bucket was at that point hanging stationary above a far corner of the hatch. Edynak continued to wait for five or six minutes, then turned his back to the crane and began to look out in the direction of the Delaware River. In making this movement, he gave no signal to the crane operator, and his left hand remained on the hatch coaming. A minute or two later, without signal or warning, the crane bucket swung about, descended, and struck Edynak's left hand. On the two days that Edynak had been aboard the *Ariana* the crane bucket had struck the coaming on five or six occasions, but the crane operator had not previously lowered the bucket without a signal.

A number of medical operations were necessary to restore partial use of Edynak's left hand. Following the accident, Edynak, who is right-handed, continued his employment with Allied at the prevailing laborer's rate, the rate he earned at the time of the accident. He lost some time from work while undergoing surgery and recuperating.

▉ Edynak brought suit against Atlantic in the United States District Court for the Eastern District of Pennsylvania, basing jurisdiction on diversity of citizenship. He claimed that Atlantic was negligent, that an improper method of unloading the *Ariana* rendered the vessel unseaworthy, and that Atlantic's negligence and the vessel's unseaworthiness proximately caused his injuries. Atlantic joined Allied as a third-party defendant. A jury returned a verdict in favor of Edynak at the end of the liability phase of a bifurcated trial. By answers to special interrogatories, the jury found that Atlantic was negligent, that the vessel was unseaworthy, and that Edynak's own negligence contributed to his injuries in the proportion of five percent. The jury subsequently assessed damages at $300,000. Judgment was entered in favor of Edynak against Atlantic in the amount of $285,000, reflecting a five percent reduction as a consequence of Edynak's contributory negligence,[5] and the third-party action against Allied was dismissed. The district court denied Atlantic's motion for judgment notwithstanding the verdict or for a new trial.

On this appeal, Atlantic argues that maritime law was inapplicable to this case; that even if maritime law was applicable, the vessel was not unseaworthy; and that the damages were excessive.[6] We affirm.

## II.

Atlantic first contends that state law rather than federal maritime law should have been applied to this case. In support of this proposition, Atlantic relies primarily on two cases: *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), and *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).

In *Victory Carriers*, Law, a longshoreman, was injured on a pier while driving a forklift owned by and under the direction of his stevedore employer. Law had picked up a load of cargo on the dock and moved it to a point alongside the *S.S. Sagamore Hill* where it was to be lifted aboard by the vessel's own equipment. As he returned to the pickup point, the overhead protection

---

**5.** Under maritime law, contributory negligence does not bar recovery. Rather, admiralty "allows such consideration of contributory negligence in mitigation of damages as justice requires." *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409–10, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953). *Accord, Palermo v. Luckenbach S.S. Co.*, 355 U.S. 20, 21, 78 S.Ct. 1, 2 L.Ed.2d 3 (1958); *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94 n. 11, 66 S.Ct. 872, 90 L.Ed. 1099 (1946);

*The Max Morris*, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890).

**6.** Atlantic does not appear to contest the dismissal of the third-party action. Appellant's position on the finding of negligence is unclear, but because of our disposition of the unseaworthiness issue, *see* Parts II and III, *infra*, we need not consider the negligence finding in any event.

rack of the forklift came loose and fell on him. He sued the vessel and its owner in federal district court, alleging that the unseaworthiness of the vessel and the negligence of its owner had caused his injuries. The unseaworthiness claim became the critical issue. The district court granted the vessel owner's motion for summary judgment on the ground that the doctrine of unseaworthiness did not extend to Law, but the United States Court of Appeals for the Fifth Circuit reversed.

The Supreme Court reversed the court of appeals. Mr. Justice White, writing for the majority, stated that the threshold question before the Court was "whether federal maritime law governs accidents suffered by a longshoreman who is injured on the dock by allegedly defective equipment owned and operated by his stevedore employer." 404 U.S. at 204, 92 S.Ct. at 420. In answering that question in the negative, Justice White observed that Law's case exhibited none of the typical elements of a maritime cause of action:

> Law was not injured by equipment that was part of the ship's usual gear or that was stored on board, the equipment that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank.

*Id.* at 213–14, 92 S.Ct. at 426. The Court held that state law, and not federal maritime law, governed Law's accident.

Atlantic argues that in the instant case, as in *Victory Carriers*, the typical elements of a maritime cause of action are particularly attenuated. Edynak was not injured by equipment that was part of the ship's usual gear or that was stored on board, nor was the equipment that injured him in any way attached to the ship, nor was the crane bucket under the control of the ship or its crew. The only element present in the instant case but lacking in *Victory Carriers* was the occurrence of the accident on board the ship. And, Atlantic submits, *Executive*

*Jet Aviation, Inc. v. City of Cleveland* establishes the insignificance of the maritime situs of Edynak's injury in invoking the coverage of federal maritime law.

*Executive Jet Aviation* involved the crash of a jet aircraft in the navigable waters of Lake Erie. As the jet was taking off from a lakefront airport owned by the City of Cleveland, it struck a flock of seagulls, lost power, crashed, and ultimately sank in the lake. The owners of the aircraft, relying on the locality of the accident to support federal admiralty jurisdiction, sued the city for damages in federal district court. That court dismissed the complaint, holding that the suit was not cognizable in admiralty, and the court of appeals affirmed.

The Supreme Court also affirmed. Mr. Justice Stewart, writing for a unanimous Court, concluded that "maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation tort cases." 409 U.S. at 261, 93 S.Ct. at 501. In addition to meeting the locality test, he said, the wrong in such cases must bear a significant relationship to traditional maritime activity, *id.* at 268, 93 S.Ct. at 504; the crash of a land-based aircraft embarking on a flight between points within the continental United States failed to meet this requirement. The language of Justice Stewart's opinion was strictly limited to accidents involving aircraft: " 'In both death and injury cases . . . it is evident that while distinctions based on locality often are in fact quite relevant where water vessels are concerned, they entirely lose their significance where aircraft, which are not geographically restrained, are concerned.' " *Id.* at 266, 93 S.Ct. at 503, quoting 7A J. Moore, Federal Practice ¶ .330[5] at 3772–73 (2d ed. 1972).

■ Even if *Executive Jet* be read to transcend aviation tort claims, and to establish a general admiralty tort rule that a connection to traditional maritime activity as well as maritime locality is necessary to invoke federal maritime law,[7] we discern

---

7. It has been suggested that *Executive Jet Aviation* establishes that "some definite maritime flavor" is now a prerequisite for all admiralty tort jurisdiction. G. Gilmore & C. Black, The

the requisite nexus in the instant case. We adopt the Fifth Circuit's criteria for determining whether torts occurring upon navigable waters have a maritime connection: the functions and roles of the parties, the types of vehicles and instrumentalities involved, the causation and the type of injury, and the traditional concepts of the role of admiralty law. *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *see* cases cited in 7A J. Moore, *supra,* ¶.325[3] at 114 n. 73 (2d ed. Supp. 1976). All four criteria are satisfied in this case. Edynak played an indispensable role in the unloading of the ship—work which the Supreme Court has characterized as historically "the work of the ship's service." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 96, 66 S.Ct. 872, 878, 90 L.Ed. 1099 (1946). The accident involved a ship, not an aircraft. Edynak's injury was allegedly the result of an improper method of unloading. And admiralty law has traditionally been concerned with the loading and unloading of vessels. *See, e. g., The Seguranca,* 58 F. 908, 909 (S.D.N.Y.1893); *The Gilbert Knapp,* 37 F. 209, 210 (E.D.Wis.1889); *Florez v. The Scotia,* 35 F. 916 (S.D.N.Y.1888).

▮ Contrary to Atlantic's suggestion, then, the occurrence of Edynak's accident on navigable waters[8] mandates the application of federal maritime law—at least once a connection to traditional maritime activity is demonstrated. But, Atlantic protests, to allow the happenstance of locality to

Law of Admiralty § 1–10 at 31 n. 98d (2d ed. 1975). *Accord,* 7A J. Moore, *supra,* ¶.325[3] at 114 (2d ed. Supp. 1976).

**8.** Under the locality test, the tort occurs where the alleged negligence takes effect. *Executive Jet Aviation, supra,* 409 U.S. at 266, 93 S.Ct. 493; *T. Smith & Son v. Taylor,* 276 U.S. 179, 181–82, 48 S.Ct. 228, 72 L.Ed. 520 (1928); *The Plymouth,* 70 U.S. (3 Wall.) 20, 35, 18 L.Ed. 125 (1866).

**9.** Atlantic points out that had Edynak been injured while standing on the pier, state law would be applied to his case. *Victory Carriers, supra* would appear to support that conclusion.

**10.** Under the Extension of Admiralty Jurisdiction Act of 1948, 46 U.S.C. § 740 (1970), "[t]he admiralty and maritime jurisdiction of the Unit-

assume such significance is certainly arbitrary.[9] Whatever the merit of that objection, almost one hundred and sixty-five years of admiralty law establish the importance of locality in determining the maritime tort jurisdiction of the federal courts. In 1813, Mr. Justice Story wrote that "[i]n regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act." *Thomas v. Lane,* 23 F.Cas. 957, 960 (C.C.D.Me.1813) (No. 13,902). The view that the gangplank roughly divides the state and maritime regimes[10] has been consistently reaffirmed through the years. *See Victory Carriers, supra,* 404 U.S. at 205 & n. 2, 92 S.Ct. 418 (citing over forty cases); *id.* at 207, 92 S.Ct. 418; *Earles v. Union Line Barge Corp.,* 486 F.2d 1097, 1100 (3d Cir. 1973). *Executive Jet Aviation* did not overrule that history and repudiate the significance of situs in determining the applicability of federal maritime law. *See* 7A J. Moore, *supra,* ¶.325[3] at 114 (2d ed. Supp. 1976). At most that case added to the locality rule of maritime tort jurisdiction the requirement that the wrong bear a significant relationship to traditional maritime activity. We hold that the district court properly applied federal maritime law rather than state law to this case.[11]

### III.

Atlantic next contends that the *Ariana* was not unseaworthy. A brief discussion of

ed States shall extend to and include all cases of damages or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

**11.** That Edynak's complaint invoked only the diversity jurisdiction of the district court is, of course, irrelevant to the applicability of federal maritime law. Pleading only diversity jurisdiction is an appropriate manner of preserving the right to a jury trial. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 359–60, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409–11, 74 S.Ct. 202, 98 L.Ed. 143 (1953); 7A J. Moore, *supra* ¶¶.53[2]–[3] at 389–91; *id.,* ¶.59[3] at 418.

the doctrine of seaworthiness must precede an analysis of Atlantic's specific contentions.

■ The owner of a ship is under an absolute non-delegable duty to furnish a seaworthy vessel. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The duty extends to seamen or those performing a seaman's duties, *Seas Shipping Co. v. Sieracki, supra; Earles v. Union Barge Line Corp., supra,* 486 F.2d at 1102, and is not satisfied by the exercise of due care. *Mahnich v. Southern Steamship Corp.,* 321 U.S. 96, 100, 64 S.Ct. 455, 88 L.Ed. 561 (1944). To be seaworthy, the "things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963). Unseaworthiness, a condition of a vessel which proximately causes injury to the protected class, *Earles, supra,* need not involve a defective condition of a physical part of the ship itself. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 499, 91 S.Ct. 514, 517–518, 27 L.Ed.2d 562 (1971). Rather,

> [a] vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service.

*Id.* (footnotes omitted). Unseaworthiness may be either a temporary or a permanent condition. *Mitchell v. Trawler Racer, Inc., supra,* 362 U.S. at 550, 80 S.Ct. 926.

■ Because liability for unseaworthiness is essentially a species of liability without fault, *Seas Shipping Co. v. Sieracki, supra,* 328 U.S. at 94–95, 66 S.Ct. 872,

it is irrelevant how the condition of unseaworthiness came into being. *Earles, supra,* 486 F.2d at 1102. The unseaworthy condition may have arisen from the conduct of persons other than the ship's own employees. *Alaska Steamship Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); *see Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 317 n. 3, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); *Carroll v. Frontera Compania Naviera, S. A.,* 390 F.2d 311, 314 (3d Cir. 1968); Annot., 77 A.L.R.2d 829 (1961). It makes no difference to the shipowner's liability that he lacked complete control over the instrumentality causing injury, *Earles, supra,* 486 F.2d at 1102, or that he had neither actual nor constructive notice of the unseaworthy condition. *Mitchell v. Trawler Racer, Inc., supra,* 362 U.S. at 549, 80 S.Ct. 926.

Atlantic raises two arguments regarding the alleged unseaworthiness of the *Ariana.* First, as a threshold matter, Atlantic asserts that Edynak was not among the class to whom the warranty of seaworthiness extends.[12] Second, relying on *Usner v. Luckenbach Overseas Corp., supra,* appellant contends that Edynak's injury was caused not by an unseaworthy condition of the vessel, but rather by the isolated, personal negligent act of a co-employee for which Atlantic cannot be held liable.

### A.

Atlantic recognizes that had it used its own crew members to unload Allied's cargo, those crew members would have been entitled to the warranty of seaworthiness. The appellant further acknowledges that had it engaged a stevedoring gang to unload Allied's cargo, the longshoremen would, under *Seas Shipping Co. v. Sieracki, supra,* be covered by the warranty because they would be doing the ship's work. But, Atlantic urges, when the employees of the cargo owner unload a vessel, they are doing the work of their employer and not the

---

12. Atlantic mischaracterizes this argument as jurisdictional. *See Kermarec v. Compagnie* *Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

work of the ship, and consequently lack the protection accorded *Sieracki* seamen.

██ Atlantic's argument misapprehends the meaning of *Sieracki.* That case held that the obligation of seaworthiness, traditionally owed by a shipowner to seamen, extends to a stevedore injured while working aboard a ship. The Supreme Court's decision indicates that the obligation does not depend on the existence of any contractual relationship between the shipowner and the person unloading the vessel, or even between the shipowner and the person's employer. Rather, the responsibility derives from the nature of the work done:

> Historically the work of loading and unloading is the work of the ship's service performed until recent times by members of the crew. . . . That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection.

*Sieracki,* 328 U.S. at 96, 66 S.Ct. at 878. The Court has several times reiterated that "*Sieracki's* legal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness." *Pope & Talbot, Inc. v. Hawn, supra,* 346 U.S. at 412–13, 74 S.Ct. 202, at 207. *Accord, Reed v. The Yaka,* 373 U.S. 410, 414–15, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); *The Tungus v. Skovgaard,* 358 U.S. 588, 595 n. 9, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959).

██ Edynak's employment by Allied, therefore, is irrelevant in determining whether he was entitled to the protection of the seaworthiness warranty. The pertinent inquiry is whether he was doing the ship's work—a question answered by reference to the traditional functions of seamen and not by an examination of his contractual relations. We believe that Edynak's work entitled him to the protection of the warranty. He played an essential part in the unloading of the *Ariana,* and unloading is traditionally the work of the ship's crew. That Edynak's particular function as a signalman was unknown in the days when seamen unloaded vessels does not deprive him of

the warranty's protection. The use of modern technology does not nullify the liability of the shipowner. *See Sieracki, supra,* 328 U.S. at 96, 66 S.Ct. 872.

### B.

Atlantic asserts that the evidence failed to establish that Edynak's injuries were caused by an unseaworthy condition of the ship. More specifically, the appellant insists that the evidence shows only that Edynak's injuries were caused by the isolated, personal negligent act of a fellow Allied employee, which, under *Usner v. Luckenbach Overseas Corp., supra,* could not render the vessel unseaworthy.

*Usner* was a longshoreman, employed by an independent stevedoring contractor, who was injured while working with his fellow employees in loading cargo aboard a ship. The circumstances under which he was injured were not disputed. *Usner* was situated on a barge from which cargo was being loaded onto the ship. His job was to "break out" bundles of cargo by securing them to a sling attached to the fall each time it was lowered from the ship's boom by the winch operator. The loading operations proceeded smoothly for some time, until on one occasion the winch operator, one of *Usner's* fellow employees, did not lower the fall far enough. *Usner* motioned to the flagman on the ship's deck to direct the winch operator to lower the fall farther. The winch operator then lowered the fall, but too far and too fast. The sling struck *Usner,* causing his injuries.

*Usner* brought an action for damages in federal district court against the owner and charterer of the vessel, alleging that the ship's unseaworthiness had caused his injuries. The district court denied the defendants' motion for summary judgment, but granted leave to take an interlocutory appeal. The United States Court of Appeals for the Fifth Circuit permitted the appeal and reversed, holding that "instant unseaworthiness" caused by the "operational negligence" of the stevedoring contractor was not a basis for recovery. *Usner v. Luckenbach Overseas Corp.,* 413 F.2d 984, 985–86 (5th Cir. 1969).

The Supreme Court affirmed. Mr. Justice Stewart's opinion for the majority emphasized that unseaworthiness is a *condition*, not an act. Because Usner's injuries were caused not by a condition of the ship, her appurtenances, her cargo, or her crew, but by the "isolated, personal negligent *act*" of Usner's fellow longshoreman, the shipowner could not be held liable for unseaworthiness. 400 U.S. at 500, 91 S.Ct. 514 (emphasis added).

Although the difference *Usner* draws between an act and a condition is difficult to apply in practice, *see* 400 U.S. at 504, 91 S.Ct. 514 (Harlan, J., dissenting), we can make two explanatory observations. First, the distinction is in part temporal: an act occurs instantaneously, whereas there must be some period of time during which a condition exists. *Ryan v. Pacific Coast Shipping Co.*, 509 F.2d 1054, 1057 n. 6 (9th Cir. 1975). Second, a condition necessarily consists of more than one act. *Id.; Caparro v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 503 F.2d 1053, 1054 (2d Cir. 1974) (per curiam).

*Usner* did not hold that the negligence of a longshoreman can never cause a vessel to be unseaworthy. If a longshoreman's negligence amounts to more than an isolated act and creates a condition of the vessel, then, even after *Usner*, the negligence can render the vessel unseaworthy. *See generally Earles v. Union Barge Line Corp., supra*, 486 F.2d 1097, 1103 n. 31, 1107 n. 61; *Ward v. Union Barge Line Corp.*, 443 F.2d 565, 571 (3d Cir. 1971). Judge Goldberg, writing for a panel of the Fifth Circuit, has provided the clearest explication of the post-*Usner* relationship between a longshoreman's negligence and a vessel's unseaworthiness:

A longshoreman or one of his fellows might engage in a *congeries* of negligent acts that are of such a character or that continue for such a length of time that they become related to the status of the vessel. That *congeries* of acts might create a "condition" of unseaworthiness, so that an individual act of negligence within or after the *congeries* might give rise to liability under the unseaworthiness doctrine. However, if the negligent act of a longshoreman is not part of any *congeries* of negligent acts connected to the status of the vessel or to its loading but is rather an isolated "instantaneous" act of negligence within an otherwise seaworthy method of loading on an otherwise seaworthy vessel, then that one act of negligence by the longshoreman or his fellows will not render the vessel unseaworthy.

*Robinson v. Showa Kaiun K.K.*, 451 F.2d 688, 690 (5th Cir. 1971). *Accord, Parker v. S/S Dorothe Olendorff*, 483 F.2d 375, 381 n. 4 (5th Cir. 1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 110 (1974).

In the instant case, the *Usner* issue was fully litigated at trial. Edynak attempted to prove that the crane operator employed an improper method of unloading the *Ariana*, rendering the vessel unseaworthy[13] and proximately causing his injuries. Atlantic countered by attempting to show that Edynak's injuries were caused by the isolated, personal negligent act of the crane operator, who, prior to this accident, had not previously lowered the crane bucket without a signal from Edynak.

We believe that the evidence permitted the jury to find that the *Ariana* was unseaworthy. There was testimony that the crane operator repeatedly lowered the crane bucket before steadying the draft, causing the bucket to swing. One witness, a stevedore superintendent, testified that lowering the bucket before it was steadied

---

**13.** The Supreme Court has indicated that an improper method of unloading can render a vessel unseaworthy. *Usner v. Luckenbach Overseas Corp., supra*, 400 U.S. at 499, 91 S.Ct. 514; *Morales v. City of Galveston*, 370 U.S. 165, 170–71, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); *see Ferrante v. Swedish American Lines*, 331 F.2d 571, 578 (3d Cir.), *petition for* *cert. dismissed*, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964). Because the focus of the plaintiff's case was on the method of unloading, and not on the fitness of the crane, it is irrelevant that the crane was shore-based. *See Burns v. Anchor-Wate Co.*, 469 F.2d 730, 733 (5th Cir. 1972).

would constitute an improper method of unloading. The signalman who had been directing the crane at the *Ariana's* number two hatch on the day of the accident averred that the crane operator at Edynak's hatch, number three, struck the coaming with the bucket five or six times. Another witness stated that the movements of the crane at the number three hatch were jerky, and that the crane operator was using the "free-fall" method of lowering the bucket. This method, it was explained, consists of allowing the bucket to fall of its own weight, using a brake to slow or stop its movement. A ship's officer, called by Edynak as an expert witness, testified that the free-fall method was improper under the circumstances because it did not give the crane operator sufficient control over the crane bucket. The proper method under the circumstances, the witness said, would have been to lower the bucket under power, in gear.

■■■ On the basis of this evidence the jury could conclude that Edynak's injuries resulted from an improper method of unloading rather than from the crane operator's isolated act of negligence in lowering the bucket without a signal. The jury could find that the free-fall method, particularly as practiced by this crane operator,

was improper because of the risk that the operator might inadvertently release the brake and drop the bucket.[14] And the evidence could be viewed to indicate that the operator used this method on many lowerings over a considerable period of time, creating a condition of unseaworthiness.

The jury was thoroughly and accurately instructed on the *Usner* issue, and we find no reversible error in the other aspects of the unseaworthiness charge.[15] The cases counsel that an unseaworthiness verdict returned by a properly charged jury ordinarily should not be disturbed. *See, e. g., Mahnich v. Southern Steamship Co., supra,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; *Earles v. Union Barge Line Corp., supra,* 486 F.2d at 1104. Heeding that advice, we affirm on the issue of liability.

## IV.

■■■ Atlantic argues that the jury's award of $300,000 to compensate Edynak for his injuries was clearly excessive, and that the trial judge should therefore have granted Atlantic's motion for a new trial. We undertake our examination of this contention with the knowledge that our standard of review is severely limited. The question of the excessiveness of a verdict is primarily a matter to be addressed to the

14. Atlantic contends that the bucket of this crane could be lowered *only* by the free-fall method. That being so, appellant maintains, the gravamen of Edynak's complaint must be that the crane itself was defective rather than that the method of unloading was improper. But the defectiveness of the crane, it is urged, could not render the *Ariana* unseaworthy, because the crane was neither appurtenant to the ship nor a part of the ship's equipment; furthermore, there was no evidence that a crane that can be lowered only by free-fall is defective.

We disagree with Atlantic's premise. Although the only witness who had viewed the crane—a witness called by Atlantic—testified that its bucket could not be powered down, other witnesses familiar with this general type of crane testified that it could indeed be powered down. The matter was a credibility issue for the jury's determination. We note also that the trial judge's charge informed the jury that the theory of Edynak's case was the impropriety of the unloading method; he specifically instructed the jury that Edynak had adduced

no evidence to establish that the crane itself was defective.

15. The trial judge charged the jury that "so long as you find that the crane was being utilized at the time of the accident in the unloading operation of the ship . . . for such purposes the crane and the bucket would be considered in the eyes of the law as an appliance or appurtenance or tool or piece of equipment of the ship." This instruction would appear to be inaccurate in light of *Victory Carriers, supra*; by the trial judge's reasoning, the forklift in *Victory Carriers* would have been part of the ship's equipment. *See Burns v. Anchor-Wate, supra,* 469 F.2d at 733. We deem any error in this regard as harmless, however, because the focus of Edynak's case was on the method of unloading, and not on the fitness of the crane. *See* note 13 *supra.* In fact, the trial judge specifically instructed the jury that there was no evidence from which they could conclude that the crane was defective. *See* note 14 *supra.*

sound discretion of the district judge, and we may not disturb his determination unless a "manifest abuse of discretion" be shown. *Wooley v. Great Atlantic & Pacific Tea Co.*, 281 F.2d 78, 80 (3d Cir. 1960); *see Moore v. Swenfurth*, 368 F.2d 317 (3d Cir. 1966). Stated another way, we may reverse the determination of the district judge and grant a new trial only if the verdict is "so grossly excessive as to shock the judicial conscience." *Russell v. Monongahela Ry. Co.*, 262 F.2d 349, 352 (3d Cir. 1958). It is simply not our function to assess what would constitute fair recompense for the injuries sustained by the plaintiff; our duty is instead to ascertain whether the trial judge, weighing all the evidence on damages, "has exercised his considered judgment as to a rational verdict in a judicial manner." *Id. See generally Taylor v. Washington Terminal Co.*, 133 U.S.App.D.C. 110, 409 F.2d 145, 148, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969); Note, *Remittitur Practice in the Federal Courts*, 76 Colum.L.Rev. 229, 303–04 (1976). With these guidelines in mind, we turn to the evidence adduced in support of the damage award.

The parties stipulated that Edynak's medical expense totaled $12,746.90, and there was no evidence that he would incur additional medical expenses in the future. His wage loss was calculated to be $13,-669.19. We can deduce, therefore, that the jury awarded approximately $273,500 for loss of earning capacity and for pain and suffering.

There was little evidence to establish any significant loss of earning capacity. At the time of his accident in 1971, Edynak was classified as a laborer. He had joined Allied as a laborer in 1964, although he had spent some time working as a guard, process man, and material handler between the time of his hiring and the time of his accident. At the time of trial, Edynak was still classified as a laborer; he now performs a variety of chores as a groundskeeper, tank watcher, and janitor. In the three years prior to his accident, Edynak earned a maximum of $7800 per year at Allied. In 1973,

he made slightly over $8500, and in 1974, approximately $8330. Edynak testified that because he is no longer allowed on ships, he is not eligible for as much overtime as other employees. He conceded on cross-examination, however that overtime work is voluntary, and that he has not requested any. Allied's superintendent of employee relations averred that while Edynak's present job is reasonably secure, his prospects for promotion have been limited by his disability.

The evidence regarding pain and suffering was more substantial. A surgeon testified that when he first saw Edynak on the day of the accident, the skin on the back of his hand was completely torn away and the second, third, and fourth metacarpal bones—the bones of the top of the hand connecting the wrist to the fingers—were fractured. At that time, the surgeon stated, Edynak was "severely traumatized from a psychological point of view." Replacing the lost skin involved a grafting process whereby Edynak's hand was sewn to his abdomen. His hand remained in that position for thirty-four days. Nine surgical procedures, performed over the course of more than three years, were necessary to reconstruct the hand. Restoration of the hand to normal use, however, was impossible; the surgeon estimated that Edynak had suffered a permanent, seventy-five percent loss of the use of his hand. Edynak can use his left hand to open a car door, pinch and grasp, turn a doorknob, and drive, but he is unable to do anything requiring good coordination of the fingers. He testified that he experiences a continuous throbbing pain, and one of his physicians stated that he could do nothing specific to relieve the discomfort. Finally, there was evidence that the hand is and will remain disfigured.

Although the award was quite high, it was not "contrary to all reason." *Taylor v. Washington Terminal Co., supra*, 409 F.2d at 148. The deference we owe the trial judge, "who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial

rather than upon a cold record," and the respect due "the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages," combine here to overcome whatever misgivings we might have regarding the size of the verdict. *Id.*[16] Had we been the district judge, we might perhaps have found the verdict excessive and granted Atlantic's motion for a new trial. But we cannot say that the award shocks the judicial conscience, and therefore cannot hold that the district court's denial of the motion constituted a manifest abuse of discretion.

### V.

We have carefully examined the other contentions raised by the appellant, and we find them to be without merit.

Accordingly, the judgment of the district court will be affirmed.

---

**16.** Evidence of pain and suffering is particularly ill-suited to review upon only a written record.